*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 62**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

METROPOLITAN WATER DISTRICT
OF SALT LAKE & SANDY,
*Appellee,*

*v.*

SHCH ALASKA TRUST, ANDREA A. OVESON,
ROCKY MOUNTAIN HOLDING TRUST,[*]
*Appellants.*

No. 20171044
Filed October 16, 2019

On Direct Appeal

Fourth District, Heber
The Honorable Jennifer A. Brown
No. 130500126

Attorneys:

Shawn E. Draney, Scott H. Martin, Danica N. Cepernich,
Salt Lake City, for appellee

Edwin C. Barnes, Perrin R. Love, Shannon K. Zollinger,
Salt Lake City, Kay L. McIff, Richfield, for appellants

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE
PETERSEN, and JUDGE HAGEN joined.

Having recused himself, JUSTICE PEARCE does not participate herein;
COURT OF APPEALS JUDGE DIANA HAGEN sat.

---

[*] Jana Gunderson, Steven H. Ault, Connie Ault, and Max Zipline,
LLC are also Appellants in this case.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1   The Metropolitan Water District of Salt Lake & Sandy (Metro) owns an easement across land owned by the SHCH Alaska Trust (Alaska).[1]  Under Utah's easement case law, Metro's status as an easement holder gives it a right to use Alaska's property. And under that case law, neither Alaska nor Metro may unreasonably interfere with the other's rights in the property. The district court found, however, that Metro's status as a limited purpose local district of the State of Utah grants Metro additional authority — authority beyond what is traditionally enjoyed by an easement holder — to impose restrictions on Alaska's use of the property. In other words, the district court found that Metro has authority to impose land use restrictions on real property it does not own. We disagree.

¶2   Based on our interpretation of the relevant statutes, we hold that Metro's authority over Alaska's property does not extend beyond the authority it derives from its easement rights. Accordingly, we reverse the district court's grant of summary judgment and remand the case to the district court for proceedings consistent with this opinion.

¶3   The district court also determined that Metro's easement was 200 feet wide. This determination was based on a written description of the easement created by a civil engineer for the Federal Bureau of Reclamation in 1961. This too was error. Although the civil engineer's written description may provide evidence of the scope of the easement, the court erred in concluding that it was dispositive. Accordingly, we also reverse the district court's determination regarding the easement's scope and remand for proceedings consistent with this opinion.

**Background**

¶4   The dispute in this case arose after Alaska attempted to open a commercial zipline course on its property in Wasatch County. After applying for a conditional use permit from Wasatch County,

---

[1]  SHCH Alaska Trust acquired the property in 2015, approximately three years after the dispute in this case arose. Because Alaska is the successor-in-interest to the litigation, we refer to all the appellants in this case as Alaska.

Alaska was informed by Metro that Metro had enacted regulations restricting Alaska's use of Alaska's property within the Salt Lake Aqueduct Corridor.

¶5    The Salt Lake Aqueduct Corridor is a forty-two mile area, stretching from the Deer Creek Reservoir to Salt Lake County, through which Metro operates a water pipeline. Although Metro owns some of the land within the Corridor, it has only easement rights for other portions of the Corridor. These easement rights allow Metro to enter onto the easement lands in order to operate and maintain the pipeline as needed. To protect Metro's facilities and operations, Metro purported to enact regulations restricting certain uses of all land within the Corridor. Metro maintains that these restrictions apply to all land regardless of who owns that land.

¶6    Metro's regulations prohibit fee owners from constructing buildings, structures, or other encumbrances, and from planting trees and vines, on their own land within the Corridor. Additionally, the regulations contain specifications regarding the types of fences allowed, as well as a list of items that cannot be stored on land within the Corridor. Finally, the regulations require fee owners to obtain licenses from Metro before conducting certain activities on the fee owners' land. Pursuant to these regulations, Metro informed Alaska that Alaska was required to obtain a license before installing its commercial zipline course.

¶7    Although Alaska initially considered complying with Metro's demands, it ultimately decided to proceed with its zipline operation without obtaining Metro's approval. Metro filed a complaint in the district court soon after, requesting a mandatory injunction requiring Alaska to comply with Metro's regulations. Metro also requested, among other things, declaratory judgment regarding its property interests and regulatory authority in and over the property. Alaska responded with a counterclaim for declaratory judgment regarding its property interest.

¶8    Both parties subsequently filed motions for summary judgment. Alaska argued that Metro did not have an easement across Alaska's property, and that, even if Metro did, Metro did not have authority, as an easement holder, to regulate Alaska's use of that property. Metro, in contrast, argued it had regulatory authority, by statute, to regulate non-Metro property. After multiple hearings on these issues, the district court granted summary judgment in Metro's favor. Title 17B of the Utah Code (Limited Purpose Local Districts Act or Act) governs the authority enjoyed by limited purpose local districts. The court found that, when "read together,"

the provisions of the Act "confer upon [Metro] the authority to regulate private uses of its aqueduct corridors." The court also found that Alaska, and Alaska's predecessors in interest, had acquired the property subject to an easement 200 feet in width. The parties stipulated to a dismissal of the remaining claims in the case and Alaska appealed. We have jurisdiction pursuant to Utah Code section 78A-3-102(j).

**Standard of Review**

¶9    We are asked to review the district court's grant of summary judgment. We review a grant of summary judgment for correctness, giving no deference to the district court, and we review the facts, and inferences to be drawn therefrom, in the light most favorable to the nonmoving party.[2] As part of our review of the district court's grant of summary judgment, we must review the court's interpretation of a statute. Statutory interpretation presents a question of law we review for correctness.[3]

**Analysis**

¶10 Alaska raises two issues on appeal. First, it argues the district court erred in interpreting the provisions of Utah's Limited Purpose Local Districts Act as authorizing Metro to enact legislation regulating Alaska's use of Alaska's property. Second, it argues the district court erred in determining that Alaska acquired the property at issue subject to Metro's "200-foot" easement. Because no provision in the Act authorizes Metro to regulate Alaska's use of Alaska's property, Metro's ability to restrict Alaska's use of the property is limited to the ability to enforce the rights it derives from its easement. Accordingly, we remand this case to the district court for a determination regarding Metro's easement-based authority. And because the district court's reliance on certain evidence regarding the scope of the easement was misplaced, we also remand for a new determination regarding the easement's scope.

I. Metro Does Not Have Authority to Directly Regulate Alaska's Use of Alaska's Own Property

¶11   Alaska argues the district court's summary judgment ruling was based on a misreading of the Limited Purpose Local Districts

---

[2] *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 7, 48 P.3d 941.

[3] *Utah Dep't of Transp. v. FPA W. Point, LLC*, 2012 UT 79, ¶ 9, 304 P.3d 810.

Act. The district court relied upon a number of provisions in the Act in determining that, when "[r]ead together," the provisions of the Act "confer upon [Metro] the authority to regulate private uses of its aqueduct corridors," even where a private party owns the land over which the Corridor passes. But the district court misinterpreted the provisions in the Act. Nothing in the Act grants Metro authority to enact legislation regulating the property rights of others. Instead, Metro's authority to regulate property is restricted to property it owns, and, where that regulation intersects with the property rights of others, general property principles govern the parties' respective property rights.

*A. The plain language of the Limited Purpose Local Districts Act does not provide Metro with regulatory authority over the property*

¶12 Under article XI, section 8 of the Utah Constitution, local districts may exercise only those powers provided by statute. So we must determine whether any provision in the Act confers authority on Metro to enact legislation regulating property it does not own.[4]

¶13 Before determining whether Metro has the regulatory authority it claims, we must define the nature of that authority. For this reason, we requested supplemental briefing from the parties regarding how the regulations at issue should be categorized. In their supplemental briefs, both parties agree the authority at issue here is legislative, rather than administrative, in nature. More specifically, Alaska categorizes the regulations as "land use regulations." Metro, on the other hand, declines to characterize the nature of the regulations. Although Metro concedes the regulations govern uses of land, it argues "it is not necessary to put a specific

---

[4] *See Basin Flying Serv. v. Pub. Serv. Comm'n*, 531 P.2d 1303, 1305 (Utah 1975) ("[I]t is well established that a regulatory body such as the Public Service Commission, which is created by and derives its powers and duties from statute, has no inherent regulatory powers, but only those which are expressly granted, or which are clearly implied as necessary to the discharge of the duties and responsibilities imposed upon it."); *see also* Nadav Shoked, *Quasi-Cities*, 93 B.U. L. REV. 1971, 1997–98 (2013) (defining a special district as a governmental entity lacking powers of regulation beyond its facilities, and explaining that regulatory powers "are antithetical to the special district as traditionally conceived in U.S. law").

label on [the nature of] its Regulations." In support, Metro points to a number of ordinances Salt Lake City has enacted governing land use in some way but that, according to Metro, do not fall within the category of a "land use regulation" as defined in the municipal land use regulation act.[5] But this argument fails because it overlooks a fundamental difference between the authority of Salt Lake City, a municipality, and Metro, a limited purpose local district.

¶14 As we explained above, under article XI, section 8, of the Utah Constitution, a limited purpose local district may exercise only those powers provided by statute. Under article XI, section 5, in contrast, a municipality is granted "the authority to exercise all powers relating to municipal affairs, and to adopt and enforce within its limits, local police, sanitary and similar regulations not in conflict with the general law." Thus a municipal ordinance or regulation is constitutionally valid unless it conflicts with a law of the state. But a regulation of a local district is constitutionally valid only where the authority to enact the regulation has been specifically granted by statute. So even though it may not always be necessary to define the nature of a municipal regulation, we cannot rule on the validity of a local district's regulation without first defining the nature of the authority necessary to enact it.

¶15 The regulations at issue are properly characterized as land use regulations. Through the regulations, Metro purports to govern how all land within the forty-two-mile Corridor may be used. The regulations prohibit the construction of buildings, structures, or other "encumbrances," as well as the planting of trees and vines, within the Corridor. They also contain specifications regarding the types of fences allowed, as well as a list of items that cannot be stored on land within the Corridor. And the regulations require fee owners to obtain licenses from Metro before conducting certain activities on the fee owners' land. Each of these restrictions "governs the use or development of land" and thus fits within the definition of a "land use regulation" provided in the city and county land use regulation acts.[6] Accordingly, we must determine whether the

---

[5] *See* UTAH CODE § 10–9a–103 (defining "Land use regulation" as "a legislative decision enacted by ordinance, law, code, map, resolution, specification, fee, or rule that governs the use or development of land").

[6] *Id.*; *id.* § 17–27a–103.

Limited Purpose Local Districts Act grants Metro authority to enact land use regulations. We hold it does not.

¶16 When we interpret "the meaning of a statute we begin by analyzing the plain language."[7] "But we do not interpret the 'plain meaning' of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)."[8] "If the plain language is unambiguous then we need not look beyond it."[9] In this case, the district court erred in interpreting the Act because it based its interpretation of the Act on what it perceived to be the purpose of a few, isolated provisions, rather than on the meaning of a specific textual provision within the context of the Act as a whole.

¶17 In its summary judgment ruling, the district court cited four of the Act's provisions in support of its determination that Metro had authority to regulate Alaska's use of Alaska's property.[10] But the court did not support its assertion with analysis of the meaning of those provisions. Instead, it stated that when "read together" these provisions "confer upon [Metro] the authority to regulate private uses of its aqueduct corridors." This was so, the court explained, because these provisions "reflect the understanding that in order for a local district, such as [Metro], to operate effectively, it must have the freedom to make its own rules and regulations and to establish some uniformity to what it does."

¶18 On appeal, Metro defends the district court's summary judgment ruling by citing five of the Act's provisions (the four provisions cited by the district court plus one additional provision). But, like the district court, Metro fails to show that a specific provision grants it authority to regulate Alaska's property. Instead, Metro argues that when "[t]aken together, these provisions clearly establish [its] authority to regulate . . . the terms on which it will and will not agree to allow private individuals to use [Metro's] property,

---

[7] *R & R Indus. Park, L.L.C. v. Utah Prop. & Cas. Ins. Guar. Ass'n*, 2008 UT 80, ¶ 23, 199 P.3d 917.

[8] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465.

[9] *R & R Indus. Park*, 2008 UT 80, ¶ 23.

[10] UTAH CODE §§ 17B-1-103(2)(q), -103(2)(t), -301(2)(i), and -301(2)(o).

including the fee owners of property over which [Metro] holds an easement." But none of the cited provisions grant Metro such authority, either on their own or when read together. We examine each provision in turn.

1. Utah Code section 17B-1-103(2)(d)

¶19 The first provision cited by Metro is Utah Code section 17B-1-103(2)(d), which grants Metro authority to "acquire or construct works, facilities, and improvements necessary or convenient to the full exercise of [Metro's] powers, and operate, control, maintain, and use those works, facilities, and improvements." Metro does not explain how section 103(2)(d) would authorize it to regulate Alaska's property.[11] And nothing in the language of this provision appears to provide such authority.

¶20 Section 103(2)(d) authorizes Metro to "operate, control, maintain, and use . . . works, facilities, and improvements" it has "acquire[d] or construct[ed]." But Alaska has not challenged Metro's authority to use or maintain any "works, facilities, [or] improvements" Metro has acquired. Instead, it has challenged Metro's authority to regulate Alaska's use of Alaska's real property in a way that unlawfully expands Metro's property interests. Because Alaska concedes that Metro has the right, through its easement, to enter the property as is necessary to "operate, control, maintain, and use" Metro's pipeline, section 103(2)(d) is not at issue in this case.

2. Utah Code section 17B-1-103(2)(t)

¶21 Metro also argues that section 17B–1–103(2)(t) authorizes it to regulate Alaska's use of Alaska's property. Section 103(2)(t) states the following:

> [U]pon the terms and for the consideration . . . [Metro may] agree:
>
> (i)
>
> > (A) with another political subdivision of the state; or

---

[11] The district court did not cite, and therefore did not rely on, this provision in its summary judgment ruling.

(B) with a public or private owner of property on which [Metro] has a right-of-way or adjacent to which [Metro] owns fee title to property; and

(ii) to allow the use of property:

(A) owned by [Metro]; or

(B) on which [Metro] has a right-of-way.

The parties offer two, opposing interpretations of this provision: Alaska argues that it authorizes Metro to contract away its property rights or to contract for additional property rights; Metro argues that it gives Metro authority to permit (or to not permit) a fee owner to use his or her land if the land is burdened by a Metro-owned easement. We reject Metro's argument because, when we consider the meaning of the term "right-of-way" in connection with the rest of the Act, only Alaska's interpretation is reasonable.[12]

¶22 Metro appears to interpret the provision as though it changes the nature of the property rights Metro derives from its right-of-way across Alaska's property. But this interpretation is unreasonable because it distorts the common law meaning of the term "right-of-way," and, in this way, is inconsistent with other provisions in the Act.[13]

¶23 A right-of-way, or easement, is an "interest in land owned by another person, consisting in the right to use or control the

---

[12] *See State v. Durant*, 674 P.2d 638, 647 (Utah 1983) (Stewart, J., dissenting) ("Where the language of a statute is subject to some doubt, reference to common-law principles may provide a valuable clue as to whether a particular situation is controlled by the statute."), *abrogated on other grounds by State v. Jimenez*, 2012 UT 41, 284 P.3d 640; *see also Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 8, 61 P.3d 989 (explaining that common-law principles are preempted by statute only where the common-law principles, associated with the subject matter of the statute, are expressly denied or where a statute's plain language or structure and purpose demonstrate a legislative intent to preempt that area of the law).

[13] *See Durant*, 674 P.2d at 647 (Stewart, J., dissenting) ("As Lord Coke stated, '[t]o know what the common law was before the making of the statute is the very lock and key to set open the windows of the statute.'").

land . . . for a specific limited purpose."[14] The land upon which the easement rests is referred to as the "servient estate," and the land benefitting from the easement (the easement holder's land) is called the "dominant estate."[15] So in this case, Alaska is the owner of the servient estate and Metro is the owner of the dominant estate. And, under common law easement principles, Metro's status as an owner of the dominant estate does not give Metro authority to dictate the terms upon which Alaska, the owner of the servient estate, may use the property at issue.[16]

¶24 It is well-established "that the owner of the servient estate may use his property in any manner and for any purpose consistent with the rights of the owner of the dominant estate," and although "the owner of the dominant estate may enjoy to the fullest extent the rights conferred by his easement, he may not alter its character so as to further burden or increase the restriction upon the servient estate."[17] In other words, under the parties' existing property rights, Metro, as the dominant estate holder, has the right to use the easement across Alaska's property to its fullest extent, but it does not have authority to prevent Alaska from using the property unless Alaska's use unreasonably interferes with Metro's easement right.[18] So by reading section 103(2)(t) as authorizing Metro to prohibit Alaska from using the property, Metro suggests that the provision implicitly overrides the parties' respective common law rights in the property.

¶25 Under Metro's interpretation, Metro, the owner of the dominant estate, could dictate the terms upon which Alaska, the

---

[14] *Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[15] *Id.* (emphases omitted).

[16] *Id.* ("Unlike a lease or license, an easement may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land.").

[17] *McBride v. McBride*, 581 P.2d 996, 997 (Utah 1978).

[18] *See N. Union Canal Co. v. Newell*, 550 P.2d 178, 180 (Utah 1976) (explaining that the land owner over which a canal easement passed did not need to obtain permission from the canal easement holder before placing a fence across the property as long as the fence did not "unreasonably restrict or interfere with the proper use of the plaintiff's easement").

owner of the servient estate, could use the property. In fact, Metro argues that the provision would authorize Metro to prohibit the fee owner from using the property at all. So, in effect, this interpretation of the statute would transform Metro into a fee owner of the property and reduce Alaska, the fee owner, to a potential easement holder. Thus Metro's interpretation of section 103(2)(t) is inconsistent with common law principles regarding easement rights.[19] Accordingly, it is unreasonable.

¶26 Additionally, by overriding common law principles regarding the parties' property rights, Metro's interpretation of the provision is inconsistent with other portions of section 103(2). Other provisions in section 103(2) make it clear that Metro's authority is subject to the property rights of others. For example, sections 103(2)(a) and (b) authorize Metro to "acquire, by any lawful means," real property or an interest in real property. And section 103(2)(h) authorizes Metro to use the state's eminent domain power to acquire necessary property rights. So these provisions require Metro to acquire property interests (and the consequent ability to fully control those property interests) in a way that respects the traditional property rights of others: "by any *lawful* means" (presumably through purchase or license) or by using the state's eminent domain power.

¶27 So the provisions in section 103 dealing specifically with a local district's ability to obtain control over real property suggest that local districts cannot simply disregard the property rights of others. In other words, the other provisions in section 103 suggest that Metro, as a local district, cannot exercise control over Alaska's real property in a way that would go beyond Metro's property rights or would unlawfully infringe on Alaska's property rights. And for this reason it would be unreasonable to interpret section 103(2)(t), without more explicit language, as though it gave Metro, as the

---

[19] *See OLP, L.L.C. v. Burningham*, 2009 UT 75, ¶ 16, 225 P.3d 177 ("Traditionally, the legislature may change the common law only explicitly." (internal quotation marks omitted)); *see also Anderson v. Bell*, 2010 UT 47, ¶¶ 16–17, 234 P.3d 1147 (interpreting a statute in light of common law principles), *superseded on other grounds by statute*, UTAH CODE § 20A-9-502, *as recognized in Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 9, 428 P.3d 1096.

easement holder, authority to dictate how Alaska, the fee holder, may use its property.[20]

¶28 In contrast to Metro's proposed interpretation, Alaska's interpretation is consistent with common-law easement principles. Under Alaska's interpretation, the provision authorizes Metro to negotiate with other parties regarding the parties' and Metro's *existing* property rights. So, for example, it would authorize Metro to enter into a contract with another political subdivision whereby the other political subdivision agrees to pay Metro in order to use Metro's easement across private land. And, relevant to Metro's property interest in this case, it would also authorize Metro to enter into a contract with a person who owns property encumbered by a Metro easement to allow that person to use the encumbered property in a way that would violate Metro's property interest absent the agreement. But it would not authorize Metro to lease, sell, or license property interests it does not own, nor to dictate how a private property owner may use his or her property rights. This interpretation, unlike Metro's proposed interpretation, is consistent with traditional property principles regarding the nature of the respective parties' existing property rights.

¶29 Because it is unreasonable to interpret section 103(2)(t) as granting Metro authority to dictate how fee owners of property may use, or not use, their property, we hold that the only reasonable interpretation of section 103(2)(t) is that it merely authorizes Metro to negotiate agreements regarding Metro's property interests. Accordingly, section 103(2)(t) does not grant Metro authority to prohibit Alaska from using Alaska's property.[21]

---

[20] *See Heber Light & Power Co. v. Utah Pub. Serv. Comm'n*, 2010 UT 27, ¶ 17, 231 P.3d 1203 ("When a specific power is conferred by statute upon a . . . commission with limited powers, the powers are limited to such as are specifically mentioned. Accordingly, to ensure that the administrative powers of the [Commission] are not overextended, any reasonable doubt of the existence of any power must be resolved against the exercise thereof." (alterations in original) (citations omitted) (internal quotation marks omitted)).

[21] Not only do these other provisions suggest it would be unreasonable to interpret section 103(2)(t) as though it upended traditional common law principles, the provisions also suggest that section 103(2)(t) does not speak to Metro's authority over real

(Continued)

3. Utah Code section 17B-1-103(2)(q)

¶30 Next, Metro and the district court cite section 17B-1-103(2)(q), which states that Metro may "perform any act or exercise any power reasonably necessary for the efficient operation of the local district in carrying out its purposes." Once again, Metro does not specifically address the meaning of this provision. Instead, Metro argues that its regulation of private property throughout the Corridor is authorized by section 103 generally because the regulation of all private property within the Corridor is vital to Metro's purposes. But we do not interpret section 103(2)(q) as granting Metro the regulatory authority it seeks, because, when section 103(2)(q) is read in the context of other statutory provisions, it is not reasonably interpreted as authorizing Metro to enact legislation regulating property it does not own.

¶31 An interpretation of section 103(2)(q) that grants local districts the authority to regulate property the local districts do not own is unreasonable when compared to the land use statutes applicable to cities and counties. The Municipal Land Use, Development, and Management Act and the County Land Use, Development, and Management Act authorize cities and counties, respectively, to enact land use regulations. Both acts establish comprehensive statutory schemes that carefully define, and limit, the city's and county's authority to enact land use legislation.

¶32 For example, the acts require cities and counties to establish planning commissions for the purpose of preparing and adopting land use regulations.[22] And they require the planning commissions to provide notice to the public, hold public hearings, and consider written objections to proposed land use regulations before the commissions recommend a proposed land use regulation be enacted.[23] The acts also impose a number of specific limitations on

property it does not own. "[W]here two statutes treat the same subject matter, and one statute is general while the other is specific, the specific provision controls." *State v. Bagshaw*, 836 P.2d 1384, 1386 (Utah Ct. App. 1992) (alteration in original). Because sections 103(2)(a)–(b) and 103(2)(h) specifically address the manner in which Metro may obtain control over the real property it does not own, those provisions control the manner in which Metro may obtain control of the property of others.

[22] UTAH CODE § 10–9a–502; *id.* § 17–27a–502.

[23] *Id.* § 10–9a–502; *id.* § 17–27a–502.

the types of land use regulations cities and counties may enact.[24] And they require cities and counties to establish "one or more appeal authorities" to hear and decide challenges to land use regulations and decisions.[25] The effect of these provisions is to prevent cities and counties from imposing land use regulations on private landowners before the city or county has carefully considered the issues presented and provided landowners ample opportunity to participate in the legislative process.

¶33 Additionally, other provisions of the land use regulation acts make it clear that the legislature did not intend to grant this regulatory authority to other political subdivisions of the state. The acts limit the authority to enact land use regulations to the "legislative bod[ies]" of the city or county.[26] And the acts specifically subject all political subdivisions, including local districts, to the requirements of "any applicable land use ordinance" when "using any area, land, or building situated within that [city or county]."[27] Thus the acts identify the legislative bodies of cities and counties as the only political entities with authority to promulgate land use regulations, and they specifically state that local districts are subject to that authority.

¶34 This reading of the land use acts for cities and counties is echoed in the Limited Purpose Local Districts Act. For example, Utah Code section 17B–1–119 states that "local district[s] shall comply with [applicable city and county land use statutes] *if a land use authority consults with or allows* the local district *to participate in any way* in a land use authority's land use development review or approval process."[28] By differentiating between "local district[s]" and "land use authorit[ies]," this statute implies that local districts

---

[24] *See generally id.* § 10–9a–501 *et seq.; id.* § 17–27a–501 *et seq.*

[25] *Id.* § 10–9a–701; *id.* § 17–27a–701.

[26] *Id.* § 10–9a–501; *id.* § 17–27a–501. Significantly, the Act does not define the governing body of local districts as a "legislative body." *Id.* § 17B–1–201 (defining the "governing body" of "a county or municipality" as "the legislative body of the county or municipality" and the "governing body" of a "local district" as "the board of trustees of the local district").

[27] *Id.* § 10–9a–305; *see also id.* § 17–27a–305.

[28] *Id.* § 17B-1-119 (emphases added).

are not land use authorities. And we read the phrase "if a land use authority consults with or allows the local district to participate in any way," as limiting a local district's role in the "land use development review or approval process" to consulting with the land use authority, or to participating to the extent allowed by the land use authority. Thus this statute suggests that local districts do not have independent authority to establish land use regulations.[29]

¶35  Because the city and county land use regulation acts clearly limit the authority to enact land use regulations over private property to the legislative bodies of cities and counties, and section 17B–1–119 of the Limited Purpose Local Districts Act limits local districts' role in the creation of land use regulations to consulting with the legislative body responsible for such regulations, it would be unreasonable to read section 103(2)(q) as though it conferred independent land-use regulatory authority on local districts.

¶36 Finally, a reading of section 103(2)(q) that authorizes regulatory authority over land use would be unreasonably broad because it would render most of section 103 and the Act superfluous. For example, because section 103 establishes specific grants of power for "limited purpose local districts," were we to read section 103(2)(q) to encompass all acts and powers without restriction, we would make the remainder of section 103 unnecessary. The same is true as to the rest of the Act.

¶37 The Act establishes clear distinctions among the various types of local districts, and it confers specific, limited, and varying powers on those districts.[30] So by interpreting section 103(2)(q) as conferring every type of authority upon all local districts, we would

---

[29] *See also id.* § 17B-1-202(4)(a) ("[A] local district may not be created to provide and may not after its creation provide to an area the same service that may already be provided to that area by another political subdivision, unless the other political subdivision gives its written consent.").

[30] *See generally id.* § 17B-2a-101 *et seq.* Significantly, only one type of local district is specifically granted authority to provide certain "municipal services," including "planning and zoning" services. *Id.* § 17B-2a-1101 *et seq.* (establishing municipal service districts). But that type of local district may only be created by a county in unincorporated areas of the county. *Id.* § 17B-2a-1103.

effectively abolish the careful distinctions the Act establishes between the various types of local districts.[31]

¶38 In sum, it is unreasonable to interpret section 103(2)(q) as authorizing local districts to enact land use regulations because (1) the legislature has enacted comprehensive statutory schemes governing the exercise of the land use power, and these statutory schemes explicitly prohibit non-legislative bodies from using the power; (2) section 17B–1–119 limits local districts' role in land use decision-making to consulting with "land use authorit[ies]"; and (3) such a broad interpretation of section 103(2)(q) would render most of section 103 and the Act superfluous.[32]

---

[31] So instead of reading section 103(2)(q) as granting every type of authority upon all local districts, we read it as merely a catch-all provision guaranteeing local districts the additional, but incidental, authority to perform any of the functions specifically authorized by section 103. As Alaska points out in its supplemental brief, section 103(2)(q) specifically ties any authority it confers to the "efficient operations" of the local district. So before a local district may invoke authority under section 103(2)(q), it must also invoke another provision in section 103 that authorizes the specific "operation" the local district seeks to make more efficient. In this case, the only relevant provisions in section 103 would require Metro to acquire control over Alaska's land through some method recognized by law.

[32] The unreasonableness of Metro's interpretation of section 103(2)(q) is highlighted when we apply it to other local districts. Because the geographical boundaries of multiple local districts often overlap, Metro's interpretation of the provision could lead to multiple local districts enacting conflicting land use regulations over the same property. We do not find this to be a reasonable interpretation of the Act as a whole, and it is even more unreasonable when we consider the statutory provisions related to the land use authority of cities and counties. Under our interpretation of the statutory scheme, we find that the legislature intended to grant the authority to enact land use regulations only to cities and counties. So where a local district needs a land use regulation to be enacted, it must seek out the legislative body of the relevant city or county and, pursuant to Utah Code section 17B-1-119, work with that legislative body to enact it.

4. Utah Code section 17B-1-301(2)(i)

¶39 Metro also relies upon Utah Code section 17B-1-301(2)(i), which authorizes the board of trustees of local districts to "adopt and enforce rules and regulations for the orderly operation of the local district or for carrying out the district's purposes." Metro's reliance on this provision suggests that Metro reads it as granting Metro general regulatory power over property Metro does not own. But this interpretation is unreasonable when considered in context of the Act's structure.

¶40 Section 103 of the Act provides the "status and powers" of local districts. Section 301, on the other hand, provides the "duties and powers" of the board of trustees. In other words, section 103 establishes the authority of *Metro*, and section 301 establishes the authority of *the board of trustees* to control Metro. As the governing body of Metro, the board of trustees cannot exercise authority Metro has not been granted. Rather, it may exercise, consistent with section 301's provisions, only the authority specifically granted to Metro in section 103 or elsewhere in the Act. Thus none of section 301's provisions may be read as extending the board of trustees' "power" beyond what is provided Metro in other portions of the Act.

¶41 In fact, when we consider the other provisions of section 301, it is clear that section 301's purpose is to grant the board of trustees authority regarding the internal operations of the local district. For example, subsections 301(2)(a), (b), (c), (h), (k), (l), and (m) grant authority to the board of trustees to perform various administrative responsibilities, such as the authority to "fix the times of meetings," "select and use an official district seal," "enter into contracts," and to use and manage district property. And subsections 301(2)(d), (e), (f), (j), and (n) grant the board of trustees various kinds of authority over the local district's employees and other personnel. So none of the other provisions in section 301 grant the board of trustees authority beyond what has been granted to the local district in section 103 or elsewhere in the Act. Instead, they either empower the board to exercise the authority already granted to the local district or they grant the board of trustees power over the local district's *internal* operations.

¶42 With the purpose of section 301 in mind, section 301(2)(i)'s language—"adopt and enforce rules and regulations for the orderly operation of the local district or for carrying out the district's purposes"—is reasonably interpreted only as authorizing the board of trustees to adopt *internal* rules and regulations governing Metro's

operations and personnel, as well as Metro's use of Metro's property rights.[33] Accordingly, section 301(2)(i) does not grant Metro authority to control property rights it does not own.

5. Utah Code section 17B-1-301(2)(o)

¶43 Finally, Metro cites Utah Code section 17B-1-301(2)(o), which states that the *board of trustees* may "exercise all powers and perform all functions in the operation of the local district and its properties as are ordinarily exercised by the *governing body* of a political subdivision of the state and as are necessary to accomplish the purposes of the district."[34] This provision would support Metro's position only if we interpreted it as granting *Metro* authority to exercise all powers and perform all functions ordinarily exercised by other *political subdivisions*. But that is not what the provision says, and such an interpretation would be inconsistent with the structure of the Act.

¶44 As discussed above, section 301 establishes the board of trustees' authority over its local district. And that authority is necessarily limited to the authority specifically granted to the local district by statute. We do not read section 301(2)(o) as abolishing this limitation. Section 301(2)(o) specifically grants the "board of trustees" the same authority over their local districts that other "governing bodies" have over their respective "political subdivisions." Because section 301 deals with the authority of the board of trustees, and not with the authority of Metro, it is unreasonable to interpret section 301(2)(o) as granting *Metro* authority beyond what section 103 established. Instead, we read the provision as granting the *board of trustees* full authority to operate Metro and to exercise Metro's section 103 powers.

¶45 Additionally, section 301(2)(o) should not be interpreted to grant Metro "all powers" exercised by other political subdivisions because such a reading would erase the clear distinctions the Act establishes among the various types of local districts. The Act establishes various types of limited purpose local districts, and each

---

[33] *See also* Shoked, *supra* n.4 at 1998 (defining a special district as a governmental entity lacking powers of regulation beyond its facilities, and explaining that regulatory powers "are antithetical to the special district as traditionally conceived in U.S. law").

[34] UTAH CODE § 17B-1-301(2)(o) (emphasis added).

is granted specific, limited powers. So were we to interpret section 301(2)(o) as granting Metro the same authority exercised by every other type of political subdivision, including by other types of local districts, the distinctions established by the Act would become meaningless.

¶46 Because interpreting section 301(2)(o) as authorizing Metro to enact land use regulations over land it does not own would be inconsistent with the structure of the Act, and would render the distinctions between the various types of local districts meaningless, we decline to do so. Accordingly, we hold that section 301(2)(o) does not grant Metro the authority it seeks in this case.

¶47 In sum, none of the provisions Metro cites authorizes it to regulate Alaska's use of Alaska's own property. Because Metro may exercise only those powers and functions provided by statute, we hold that Metro, through its board of trustees, may regulate only its own use of its property interests. And those uses are valid only to the extent they do not unlawfully infringe on the property rights of others. In other words, Metro's authority to control or use Alaska's property is limited to the common law authority Metro derives from its easement rights.

*B. We remand this case to determine whether Alaska has unreasonably interfered with Metro's easement rights*

¶48 Because Metro does not have statutory authority to enact regulations governing Alaska's use of Alaska's property rights, the district court erred in upholding Metro's regulations on statutory grounds. But Metro retains an easement right in the property. And this right prevents Alaska from unreasonably interfering with Metro's easement.

¶49 Under Utah's property law, an easement holder has the right to use its easement (the scope of which defines the extent of the permitted use) in a way that does not unreasonably interfere with the property rights of the owner of the land.[35] And the owner of the land has the right to continue using its land so long as it does not

---

[35] *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 158 (Utah 1946) ("It is elementary that the use of an easement must be as reasonable and as little burdensome to the servient estate as the nature of the easement and its purpose will permit." (emphasis omitted)).

unreasonably interfere with the easement holder's use of its easement.[36] Whether one party's conduct interferes with the right of the other is a factual question, the answer to which depends on the particular circumstances of the parties and the nature of the easement.[37]

¶50 So even though Metro does not have authority to enact regulations aimed at protecting its easement rights,[38] it may, pursuant to its easement rights, seek to impose certain restrictions upon Alaska to prevent Alaska from unreasonably interfering with Metro's easement. Whether such restrictions are appropriate in this case presents a fact-heavy question that should be considered on remand. Because we reverse the district court's summary judgment regarding Metro's statutory authority, Metro may, on remand, pursue whatever procedural avenues that may be available for protecting its easement rights.

## II. We Remand for a Reconsideration of the Easement's Scope

¶51 Alaska also argues the district court erred in determining the scope of Metro's easement (Easement) across Alaska's land (Property). The district court made that determination based upon an assumption that a description of the Easement prepared by a civil engineer for the Federal Bureau of Reclamation was controlling. Although the engineer's description of the Easement may be helpful or persuasive in determining the scope of the Easement, we hold that the district court erred in treating that description as dispositive. Instead, the court should have made a factual determination

---

[36] *McBride*, 581 P.2d at 997 ("It is also generally accepted that the owner of the servient estate may use his property in any manner and for any purpose consistent with the rights of the owner of the dominant estate.").

[37] *Big Cottonwood*, 174 P.2d at 159 ("What is a reasonable manner for [the exercise of the easement holder's rights] is a question of fact to be decided after considering [a number of situation-specific factors].").

[38] *See N. Union Canal Co.*, 550 P.2d at 180 (explaining that the land owner over which a canal easement passed did not need to obtain permission from the canal easement holder before placing a fence across the property as long as the fence did not "unreasonably restrict or interfere with the proper use of the plaintiff's easement").

regarding the scope of the Easement as described in the Property's original land patent (the document that created the Easement).

¶52  To give context to our conclusion that the district court erred regarding the scope of the Easement, we briefly review the history of the Easement, from its creation to the present day. Under what is commonly referred to as the "1890's Act" or the "Canal Act of 1890," Congress reserved a "right of way . . . for ditches or canals constructed by the authority of the United States" in all lands then owned by the United States west of the one hundredth meridian.[39] The Easement in this case was created under the 1890's Act.

¶53  In 1907, the United States conveyed the Property at issue in this case to the State of Utah. Then, in accordance with the terms of the 1890's Act, the State of Utah conveyed the Property to Utah Power and Light (UP&L). The patent conveying the Property to UP&L stated that the Property was conveyed "subject to all rights of ways for ditches, tunnels, and telephone transmission lines that may have been constructed by authority of the United States." Thus UP&L received the Property subject to the United States' Easement.

¶54  UP&L retained title to the Property for the next eighty-five years. But during this time, between 1939 and 1951, the United States (through the Federal Bureau of Reclamation) exercised its right under the Easement to build a pipeline across the Property. In 1961, approximately ten years after the United States finished construction on the pipeline, a civil engineer for the Federal Bureau of Reclamation drafted a written description of the scope of the Easement across the Property, which was incorrectly recorded in Utah County.

¶55 Then, in 1993, UP&L's successor, PacifiCorp, sold the Property to Blake Roney. Roughly thirteen years after Mr. Roney obtained title to the Property, the United States transferred its interest in the Easement across the Property to Metro, which Metro recorded. Fifteen days later, Mr. Roney transferred title to the Property to Alaska's predecessor-in-interest.

¶56  Below, Alaska argued that Mr. Roney obtained title (in 1993) without notice that the Property was encumbered by the Easement.

---

[39] 43 U.S.C. § 945. The one hundredth meridian bisects, from south to north, the following states: Texas, Oklahoma, Kansas, Nebraska, South Dakota, and North Dakota.

But the district court disagreed, concluding that Mr. Roney accepted the Property subject to the Easement. Additionally, the court determined that the scope of the Easement was controlled by the terms of the Federal Bureau of Reclamation's 1961 written description of the easement. Although the court correctly determined that Alaska took the Property subject to the Easement, the court erred in concluding that the Bureau of Reclamation's description of the Easement was controlling as to the Easement's scope.

¶57 "[A]n easement is a transfer of an interest in real property," and the legal instrument that creates the easement defines the obligations and rights that come with it.[40] As discussed above, the Easement in this case was created under the 1890's Act and through the State's patent to UP&L. And the text of the 1890's Act and the patent do not expressly provide the dimensions of the Easement. Easements created under the 1890's Act are reserved "in perpetuity with no width or other limitations."[41] In other words, an 1890's Act easement "is as extensive as need be for its purposes."[42]

¶58 But even though an 1890's Act easement allows the easement holder to access the land to the extent needed for its

---

[40] *Wellberg Invs., LLC v. Greener Hills Subdivision*, 2014 UT App 222, ¶ 6, 336 P.3d 61 ("To interpret easements, we apply the same rules of construction used in interpreting contracts. Accordingly, we first look to the plain language of the Easement Agreement to discern the parties' intent in creating the Easement . . . ." (citations omitted)).

[41] *Weatherwax v. Yellowstone Cty.*, 75 P.3d 788, 790 (Mont. 2003); *see also Green v. Wilhite*, 93 P. 971, 973 (Idaho 1908) (explaining that "members of Congress, both those favoring and those opposing the [1890's Act], believed and understood that it would have the effect of reserving a perpetual easement and right of way to the government for ditches and canals that might thereafter be constructed by authority of the government over lands which should be entered and patented subsequent to the passage of the act"); *Unicorn Drilling, Inc. v. Heart Mountain Irrigation Dist.*, 3 P.3d 857, 860 (Wyo. 2000) ("[T]he United States has a perpetual easement over the private owner's land for construction, maintenance, and operation of the canal.").

[42] *Weatherwax*, 75 P.3d at 790.

purposes, the easement right is not exclusive of the rights of others.[43] This means that "landowners and third parties with the landowners' permission may use the [easement] if their use is not inconsistent with the operation and maintenance of the [easement]."[44] So easements created under the 1890's Act are flexible in scope—being as extensive as needed to fulfill the purposes of the easement—while imposing as little burden as reasonably possible on the owner of the property over which the easement runs.

¶59 Easements, such as the Easement in this case, that "do[] not specifically fix the location [or] width of the easement" are commonly referred to as "floating" or "roving" easements.[45] When presented with a dispute regarding the scope of a floating easement, courts must determine the "extent or width of the easement . . . by the purposes of the grant and the requirements for a safe, proper, reasonable and convenient enjoyment thereof."[46] This requires courts to balance the competing interests in the land, with the goal of providing "the maximum advantage and . . . the minimum disadvantage [to] both parties."[47]

¶60 In striking this balance, courts should be mindful of the following principle:

> Whenever there is ownership of property subject to an easement there is a dichotomy of interests, both of which must be respected and kept in balance. On the one hand, it is to be realized that the owner of the fee title, because of his general ownership, should have the use and enjoyment of his property to the highest degree possible, not inconsistent with the easement. On the other, the owner of the easement should likewise have the right to use and enjoy his easement to the

---

[43] *Unicorn Drilling*, 3 P.3d at 861 (explaining that the local district's "right-of-way [was] not exclusive").

[44] *Id.*

[45] *Salt Lake City v. J.B. & R.E. Walker, Inc.*, 253 P.2d 365, 368 (Utah 1953).

[46] *Id.*

[47] *N. Union Canal Co. v. Newell*, 550 P.2d 178, 180 (Utah 1976).

fullest extent possible not inconsistent with the rights of the fee owner.[48]

¶61 So in determining the scope of the Easement in this case, the district court should have sought to balance Metro's interest in the Easement with Alaska's interest in the Property. Then, it should have determined the best way to maximize the advantages, and to minimize the disadvantages, to both parties. But the court failed to do this. Instead, the court accepted the Federal Bureau of Reclamation's written description of the Easement as dispositive of the scope of the easement. Accordingly, we reverse and remand to the district court for a reconsideration, consistent with the legal principles set out in this opinion, of the Easement's scope.

## Conclusion

¶62 Because no provision in the Act authorizes Metro to regulate Alaska's use of Alaska's property, we hold that the district court incorrectly interpreted the Act. Accordingly, we reverse the district court's regulatory-authority determination and remand for proceedings consistent with the principles set out in this opinion. And, because the district court erred in treating some evidence regarding the scope of the easement at issue as dispositive, we reverse the court's determination regarding the easement's scope.

––––––––––––

[48] *Id.* at 179 (footnotes omitted).