1999 UT 56

Steven COLLINS, Plaintiff
and Appellant,

v.

Merrill L. WILSON, M.D., and LDS Hospital, a division of Intermountain Health Care, Inc., Defendants and Appellee.

No. 970257.

Supreme Court of Utah.

June 4, 1999.

John L. Black, Sr., John L. Black, Jr., Salt Lake City, for plaintiff

David H. Epperson, Jaryl L. Rencher, Stephen W. Owens, Salt Lake City, for Merrill L. Wilson, M.D.

HOWE, Chief Justice:

¶ 1 Plaintiff Steven Collins appeals from a judgment entered pursuant to a jury verdict against him and in favor of defendant Merrill L. Wilson, M.D., in a medical malpractice action arising out of an abdominal surgery.

## BACKGROUND

¶ 2 Collins initially sought treatment from Dr. Wilson, a general surgeon, on February 2, 1988, on the referral of an ear, nose, and throat specialist for the treatment and eventual surgical removal of enlarged lymph nodes from Collins' neck. At that time, as part of a comprehensive medical history and physical examination, Collins reported suffering frequent recurrent nausea and vomiting. Collins' digestive complaints steadily worsened; in September of 1988, Dr. Wilson referred Collins to Dr. John H. Bowers, a gastroenterologist. Dr. Bowers performed an esophagogastroduodenoscopy ("EGD")[1] on Collins; during this EGD, Dr. Bowers found numerous ulcerations and erosions in Collins' stomach lining which Dr. Bowers attributed to acid secretion.

¶ 3 As a result of these EGD findings, and a history suggesting Collins had a possible genetic predisposition to ulcer disease, Dr. Bowers followed a conservative treatment plan using an acid blocker and avoiding substances likely to irritate the stomach, such as aspirin, ibuprofen, and caffeine. Dr. Bowers also advised Collins to quit smoking. This treatment plan failed to produce favorable results and Collins' digestive problems became more serious, including increased vomiting, vomiting blood-streaked material, heartburn, and nocturnal dyspnea.[2] After an endoscopic procedure in March 1989, Dr. Bowers recommended that Collins return to Dr. Wilson for a hiatal hernia surgical repair, and a vagotomy.[3]

---

1. An EGD is a visual examination of the esophagus, stomach, and duodenum through the use of an endoscope introduced through the mouth of the patient.

2. Nocturnal dyspnea is "[l]abored breathing or shortness of breath that gets progressively worse during the day and reaches a climax at night." 4

J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* N–114 (1998).

3. A vagotomy is "[t]he surgical cutting of the vagus nerve or nerves." 6 J.E. Schmidt, *supra* note 2, at V–9. The vagus nerve "increases the secretion of the [stomach] glands and the contractions of the muscular walls of the digestive tract, including the stomach." *Id.* at V–10.

¶ 4   Prior to his surgery on May 11, 1989, Collins signed an "authorization and consent" form. The form stated that Dr. Wilson planned to perform a "repair of hiatus hernia, antrectomy,[4] [and] vagotomy"; by signing the form, Collins also consented to "additional or different procedures" as required in Dr. Wilson's professional judgment by any unforeseen conditions. During the surgery at LDS Hospital in Salt Lake City, Dr. Wilson determined that the hiatal hernia surgery was not necessary, but that a truncal vagotomy[5] and antrectomy, as predicted, were necessary and performed the procedures accordingly. Following the surgery, Dr. Wilson reported to Mrs. Collins "that everything went well [with] no complications." He further informed her that he "found no evidence of [a hiatal hernia], and therefore ... did not need to do it, but that [he] went ahead and did the antrectomy and vagotomy as previously discussed."

¶ 5   Post-operatively, Collins experienced multiple serious and severe complications, including abdominal abscesses and additional digestive problems. For eighteen months following the surgery, from August 1989 to March 1991, Dr. Wilson was not actively involved in treating Collins; his assistance was limited to authorizing prescription refills. During this period, Collins instead saw two gastroenterology specialists for treatment of his continuing digestive problems. These specialists, Dr. William Hutson and Dr. Terry Box, diagnosed Collins with motility[6] problems, specifically chronic idiopathic intestinal pseudo-obstruction of the neurogenic type.[7] In various consultations in 1989 and 1990, both doctors discussed with Collins the possible relationship between his continuing problems and Dr. Wilson's surgery. For example, Collins contacted Dr. Hutson on or shortly after September 25, 1990, and asked

if "something [was] done wrong during [Dr. Wilson's] surgery?" to which Dr. Hutson replied that "the surgery probably had something to do with his whole condition."

¶ 6   On March 24, 1993, after discussing the case with attorneys and looking over medical records from his surgery and subsequent care, Collins filed a notice of intent to commence a malpractice action against Dr. Wilson and LDS Hospital. In his notice of intent, Collins asserted several instances of malpractice. Specifically, he alleged that Dr. Wilson and the staff of LDS Hospital (1) performed surgical procedures (the antrectomy and vagotomy) to which Collins had not given an informed consent; (2) performed the allegedly unauthorized procedures in a negligent manner; (3) falsified Collins' consent form post-operatively to make it appear he had consented to the procedures; and (4) misrepresented the necessary treatment and the treatments they rendered.

¶ 7   On September 16, 1994, following Collins' deposition, both Dr. Wilson and LDS Hospital moved for summary judgment, asserting that Collins had failed to comply with section 78–14–4 of the Utah Code, which dictates in pertinent part:

> No malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs, but not to exceed four years after the date of the alleged act, omission, neglect or occurrence ....

Utah Code Ann. § 78–14–4(1) (1996). The district court denied both defendants' motions. Dr. Wilson subsequently moved for a

---

4.   An antrectomy involves "[t]he surgical removal of the antrum of the stomach (the part near the outlet), in the treatment of ... ulcer." 1 J.E. Schmidt, *supra* note 2, at A–456 to –457.

5.   A truncal vagotomy is "[t]he cutting of the two main trunks of the abdominal vagus nerves." 6 J.E. Schmidt, *supra* note 2, at T–265.

6.   Gastric motility is "[t]he movements of the walls of the stomach which aid in mixing the

food and in expelling it from the stomach into the intestine." 4 J.E. Schmidt, *supra* note 2, at G–26.

7.   This is "[a] condition of intestinal obstruction which is not mechanical but is the result of impaired peristalsis which normally moves the intestinal content forward." 2 J.E. Schmidt, *supra* note 2, at 21 (Supp. Feb. 1998). "Neurogenic" involves a dysfunction of the nerves.

bifurcated trial pursuant to Utah Code Ann. § 78–12–47 (1996).[8]

¶ 8 The trial court granted the motion, and accordingly, a three-day jury trial on the applicability of the statute of limitations was held on July 25–27, 1995, resulting in a unanimous verdict for Dr. Wilson and LDS Hospital. The jury found that Collins discovered or should have discovered his injury prior to March 24, 1991—more than two years prior to filing a notice of intent to commence the malpractice action. Following the verdict, Collins moved for a judgment notwithstanding the verdict—citing a "lack of substantial evidence to support the jury verdict"—or, alternatively, for a new trial. The court rejected the motion for judgment notwithstanding the verdict ("j.n.o.v.") and denied Collins' motion for a new trial as to LDS Hospital. However, the court granted a new trial as to Dr. Wilson on the ground that Collins had discovered new evidence.

¶ 9 The second trial on the statute of limitations issue began on February 24, 1997. Immediately prior to trial, Collins changed his theory of the case, conceding that it was possible the procedures performed were properly listed on the consent form, thereby doing away with his "fraudulent alteration" allegation. Following four days of trial, the second jury returned a verdict for Dr. Wilson, finding that Collins discovered or should have discovered the injury prior to March 24, 1991. Collins again moved for j.n.o.v., once again arguing the "fact that there is an absence of any substantial evidence to support the Jury Verdict and Judgment ... that [he] had discovered or should have discovered his legal injury prior to March 24, 1991." The district court denied this second motion for j.n.o.v. Collins appeals from the judgment in favor of Dr. Wilson, contending that the trial court erred in (1) refusing to instruct the jury on the "continuous treatment" rule, (2) denying Collins' motion for judgment notwithstanding the verdict, and (3) refusing to use a special verdict form.

8. Utah Code Ann. § 78–12–47 states in pertinent part:
In any action against a physician and surgeon ... , or a licensed hospital, ... for professional negligence ..., if the responsive pleading of

## ANALYSIS

### I. TRIAL COURT'S REFUSAL TO GIVE PROPOSED JURY INSTRUCTION

¶ 10 Collins first contends that the trial court erred in its refusal to give his proposed jury instruction addressing the "continuous treatment" rule. The proposed instruction reads as follows:

If the treatment of the physician is a continuing course and the patient's illness, injury or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute of limitations does not commence running until treatment by the doctor has terminated, unless during treatment the plaintiff learns or should have learned of the malpractice, in which case the statute runs from the time of discovery.

*See also* 1 David W. Louisell & Harold Williams, *Medical Malpractice* ¶ 13.02(3) at 13–43 to –45 (defining rule in similar terms). In sum, this rule would allow the statute of limitations to begin running only after the termination of treatment by the doctor for the particular disease or condition involved. If the patient learns of the negligence during the time of treatment, however, the discovery rule applies and the statute of limitations begins to run accordingly. Under this rule, the applicable statute of limitations is tolled in part because the trust inherent in a doctor-patient relationship may inhibit a patient's ability to discover acts that amount to malpractice. *See Haberle v. Buchwald*, 480 N.W.2d 351, 354 (Minn.Ct.App.1992) (finding need for continuous treatment rule because trust-based relationship may inhibit patient's ability to discover malpractice); *Miller v. United States*, 932 F.2d 301, 304 (4th Cir. 1991) (holding that discovery rule may deprive patient of right to place trust and confidence in physician).

the defendant pleads that the action is barred by the statute of limitations, and if either party so moves the court, the issue raised thereby may be tried separately and before any other issues in the case are tried.

¶ 11 In his brief, Collins has correctly noted that Utah courts have not yet considered the continuous treatment rule.[9] The time may come when a Utah appellate court must examine this rule in depth. However, we need not do so today.

■ ¶ 12 Even assuming that we recognized the continuous treatment rule, the facts of this case would not satisfy the rule's requirements. The post-surgery interaction between Dr. Wilson and Collins was minimal. For an eighteen-month period, Dr. Wilson was not actively involved in treating Collins except to authorize prescription refills. Merely continuing to authorize prescription refills is in no way indicative of a doctor-patient relationship that suppresses a potential plaintiff's opportunity to become aware of the alleged malpractice. That policy justification for a continuous treatment rule is absent here.

¶ 13 During the eighteen-month period, Collins instead consulted two gastroenterology specialists for treatment of his continuing digestive problems. It was these doctors, Drs. Hutson and Box, to whom Collins expressed his dissatisfaction with the results of Dr. Wilson's surgery. Furthermore, it was these doctors who indicated that the surgery may have played some part in Collins' continuing problems. Based on the foregoing, we reject Collins' first assignment of error.

## II. DENIAL OF MOTION FOR J.N.O.V.

■ ¶ 14 Collins next assigns as error the trial court's denial of his motion for j.n.o.v., arguing that the evidence presented to the jury was insufficient to sustain its verdict. A trial court is justified in granting a motion for j.n.o.v. only when the court concludes that there is no competent evidence to support the verdict after examining the evidence and all reasonable inferences therefrom in a light most favorable to the nonmoving party. See *Gustaveson v. Gregg*,

655 P.2d 693, 695 (Utah 1982). When, as here, a party challenges a court's denial of a j.n.o.v. motion with an insufficiency of the evidence argument, we undertake an analysis analogous to the trial court's, and " 'reverse only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict.' " *Seale v. Gowans*, 923 P.2d 1361, 1363 (Utah 1996) (quoting *Heslop v. Bank of Utah*, 839 P.2d 828, 839 (Utah 1992)) (citations omitted). In a sufficiency determination, an appellate court accepts as true any testimony—and all reasonable inferences derived therefrom—that tends to prove the prevailing party's case and disregards any conflicting evidence or evidence that tends to disprove the prevailing party's case. See *Turner v. General Adjustment Bureau, Inc.*, 832 P.2d 62, 65 (Utah Ct.App. 1992).

¶ 15 We turn now to the evidence at hand. In late 1989, Collins contacted Dr. William Hutson, a gastroenterologist. Dr. Hutson conducted numerous tests to identify Collins' problem. In discussing his diagnosis, Dr. Hutson testified as follows:

> A. Clinically it suggested one of two things, in all likelihood. One is that Mr. Collins may have had an abnormal result from the surgery that was performed on him, the initial surgery performed in 1989; or the other alternative is that Mr. Collins already had an underlying motility disorder ... that then may have been unmasked by a surgery, which is not an uncommon condition.
>
> . . . .
>
> Q. Had you ever discussed these two possibilities as you've just expressed it [sic] to us, as best you can recall, with either of the Collinses here, either Mr. or Mrs. Collins?
>
> A. Yes.

and, as such, the statute of limitations would not begin to run until the completion of the act giving rise to the cause of action, i.e., the negligent course of treatment. Such is not the case here, "where the only negligence alleged was the negligent and unskillful operation ... and nothing more." *Peteler*, 81 Utah at 549, 17 P.2d at 249.

---

9. Collins also notes, and we agree, that Utah courts *have* addressed a similar doctrine; namely, the "continuous negligent treatment" rule. *See, e.g., Peteler v. Robison*, 81 Utah 535, 17 P.2d 244 (1932). The continuous negligent treatment rule addresses a *course* of treatment that is allegedly negligent. The entire negligent course of treatment constitutes a single cause of action

Q. And do you recall when you did that?

A. I mean, it must have been about the same time in November, December of 1989. I recall—the first visit I recall with them was in the office of the initial visit in October of 1989. I think I gave them my opinion as to what I thought was probably going on at this time.

In a discussion with Dr. Hutson nearly a year later, the Collinses asked if "something was done wrong during that surgery," referring to the truncal vagotomy and antrectomy Dr. Wilson performed. Again, Dr. Hutson replied that "the surgery probably had something to do with [Collins'] whole condition, because that's when he really got sick." Hutson also testified that he had explained on at least one occasion that Collins' condition was incurable "no matter what the cause [of his condition], whether surgery was largely responsible or whether it unmasked the condition." Collins supported this testimony during his cross-examination:

Q. In fact, Mr. Collins, in December of 1989, isn't it true that Dr. Hutson told you that your problems either were an abnormal result from the vagotomy and antrectomy surgery, or you already had an underlying motility disorder that was unmasked by the surgery?

A. Yeah, I heard that.

Q. So you're not suggesting that Dr. Hutson is not telling the truth about conversations he had with you about those conditions and about being questioned about Dr. Wilson's operation and procedure?

A. No.

On cross-examination, Mrs. Collins originally contradicted Dr. Hutson's testimony. However, upon counsel's refreshing her memory with the transcript of Dr. Hudson's testimony, Mrs. Collins admitted that his testimony concerning their discussions was correct.

Q. Did Dr. Hutson tell you or your husband in your presence that the surgery probably had something to do with his whole condition, because that's when he really got sick?

A. Yes.

. . . .

Q. You also recall Dr. Hutson telling you and your husband in a December, 1989, conversation that your husband's problems were "abnormal results" from the vagotomy and antrectomy surgery?

A. That he specifically said he had an abnormal result from the antrectomy and vagotomy?

Q. Yes.

A. I don't recall those words specifically. We did discuss having a poor result.

Q. From Dr. Wilson's surgery, correct?

A. From surgery.

Q. That Dr. Wilson performed, correct?

A. Yes.

¶ 16 Similarly, Dr. Terry Box testified, both on direct examination and on cross-examination, that he assumed Collins' problems were "related to the stress of the surgery" and that he was "sure that we [he and Collins] discussed the possible relationship and possible cause and effect" between the vagotomy/antrectomy surgery and Collins' motility problems. When asked what possible causes would have been discussed, Dr. Box replied: "An underlying motility disturbance that was brought out by the vagotomy [and] the possibility that the vagotomy in and of itself is the primary cause of this problem. Those are the two most likely possibilities of it." At first, Collins contradicted this testimony under cross-examination, but then could not completely rule out that Dr. Box's having pointed out the connection between the original surgery and the continuing motility difficulties:

Q. Would you agree that Dr. Box discussed with you, by August of 1989, the possible cause and effect between the vagotomy and the antrectomy surgery, and the problems that you were experiencing?

A. He never said it was the vagotomy and the antrectomy.

Q. So if he testified to the contrary, then he would not be telling the truth, are you suggesting?

A. I can't remember. He might have told my wife, because every time he talked

when I got out of the endoscopy, I was under anesthetic.

Unlike her husband, however, Mrs. Collins supported Dr. Box's testimony. When Dr. Wilson's counsel asked her, "Do you disagree with Dr. Box that before the end of 1990, he told you and your husband that the vagotomy surgery was a possible cause of your husband's continuing problems?" she replied, "I don't recall him specifically saying it was because of the vagotomy, but we talked about that *it would be a poor result or a complication of the surgery,* that we weren't sure why this complication had happened." (Emphasis added.)

■ ¶ 17   While it is true that both specialists also testified that they did not ever specifically tell the Collinses that Dr. Wilson was negligent or performed the wrong surgery, we must accept as true the testimony presented and all that this testimony implies; namely, that Collins' treating physicians provided him with information suggesting that Dr. Wilson's surgery may have caused or aggravated his continuing motility problems. Even the testimony that the surgery may have uncovered or exacerbated an existing ailment should have been enough to raise the specter of causation in Collins' mind.

¶ 18   By his own admission and the admission of his wife, Collins was aware—or should have been aware—of a possible connection between Dr. Wilson's surgery and Collins' continuing motility problems, whether because of the specialists' testimony, medical records, or some other reason. On cross-examination, Collins admitted they had suspicions over two years before they commenced this lawsuit that something had gone wrong in Dr. Wilson's surgery. We note that when Dr. Wilson's attorney asked, "From September of 1990 when you were questioning, along with your wife, if something was done wrong with that surgery, why didn't you do anything about it then?" Collins did not *deny* knowing or suspecting. Instead, he simply responded, "Because I wasn't blaming nobody [sic]." In addition, Collins began suffering from the severe complications soon after Dr. Wilson's surgery. These complications forced a seven-week hospital stay, as opposed to the three- to five-day stay Collins

expected. In fact, many of Collins' expectations were dashed soon after the surgery; he admits that the lack of timely recovery, his inability to digest food normally, his extended hospital stay, and his continuing difficulties and medical problems were all contrary to his expectations.

¶ 19   We have long held that the two-year statute of limitations period commences to run only when the injured person knew or should have known of an injury and that the injury was caused by a negligent act. *See Seale,* 923 P.2d at 1363; *Foil v. Ballinger,* 601 P.2d 144, 147–48 (Utah 1979). Furthermore, "[d]iscovery of legal injury, therefore, encompasses both awareness of physical injury and knowledge that the injury is *or may be attributable to negligence.*" *Chapman v. Primary Children's Hosp.,* 784 P.2d 1181, 1184 (Utah 1989) (emphasis added). There is evidence that Collins had the requisite "awareness of physical injury" almost immediately following the initial surgery. It is reasonable for a jury to assume that as time progressed and his poor condition continued, Collins' awareness grew as well.

¶ 20   Because the Collinses' discussions with Drs. Hutson and Box took place between 1989 and 1990—over two years prior to the filing of this lawsuit—and because these discussions involved, in part, the possible connections between the original vagotomy/antrectomy surgery and the post-operative motility difficulties, and because the aftermath of the surgery was so vastly different from Collins' expectations, Collins reasonably should have had knowledge that his injury "may be attributable to negligence."

¶ 21   Thus, we conclude that the jury had evidence before it to find that Collins "discovered or should have discovered" the injury prior to March 24, 1991. Accordingly, we affirm the trial court's denial of Collins' j.n.o.v. motion.

### III.   TRIAL COURT'S REFUSAL TO USE A SPECIAL VERDICT FORM

■ ¶ 22   Collins' third assignment of error is the trial court's refusal to employ his

proposed special verdict form. Whether a trial court correctly refused to give a special verdict form is a question of law. *See State v. Carter,* 888 P.2d 629, 655 (Utah 1995). However, a court has considerable discretion in accepting proposed special verdict forms. *See, e.g., Canyon Country Store v. Bracey,* 781 P.2d 414, 420 (Utah 1989).

¶ 23 The form Collins proposed consisted of two questions:

1. Based upon a preponderance of the evidence, did Plaintiff discover, or should he have discovered, his legal injury prior to March 24, 1991.

2. State the date, or describe the event, upon which you determine that Plaintiff discovered or should have discovered his legal injury.

Instead, the trial court presented the jury with a special verdict form Dr. Wilson proposed, which was substantively similar to question 1 of Collins' proposed form: "Based upon a preponderance of the evidence as against Dr. Wilson, did plaintiff discover or should he have discovered prior to March 24, 1991, his legal injury as the phrase 'discovery of injury' is defined in these instructions?"

¶ 24 Collins asserts that the jury was required under Utah law to specify exactly what event they determined should have placed him on notice of his legal injury. However, this is not the legal test accepted in Utah. The statute of limitations does not require a plaintiff to receive full enlightenment concerning the cause and date of his legal injury. Instead, it is enough that the jury determined, in Collins' own proposed language, "[b]ased upon a preponderance of the evidence," that Collins discovered *or should have discovered* "his legal injury prior to March 24, 1991." Collins argues that, absent the jury's identifying a specific date of discovery, the trial court and the appellate courts are left "to guess what the jury was thinking." However, in this case the evidence is sufficiently straightforward to eliminate such guesswork.

¶ 25 The jury did not experience some mystical epiphany in reaching their verdict; rather, their verdict was based upon the totality of the evidence, following four days of testimony and evidence, including evidence of numerous conversations and letters between the Collinses and their doctors discussing the possible connection between the surgery and Collins' motility problems. We therefore cannot say that the trial court abused its discretion in refusing to use Collins' proposed verdict form.

## CONCLUSION

¶ 26 In view of the foregoing analysis, we reject each of Collins' three assignments of error and uphold the jury's verdict barring Collins' allegations under the statute of limitations governing medical malpractice. The judgment of the trial court is hereby affirmed.

¶ 27 Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.

¶ 28 Justice STEWART concurs in the result.

