2022 UT App 58

## THE UTAH COURT OF APPEALS

EMILY SENKOSKY,
Appellant,
*v.*
BISTRO 412 LLC,
Appellee.

Opinion
No. 20190854-CA
Filed May 12, 2022

Third District Court, Silver Summit Department
The Honorable Kent R. Holmberg
No. 170500211

Emily Adams and Freyja Johnson,
Attorneys for Appellant

Matthew L. Lalli and Sarah A. Hafen,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

ORME, Judge:

¶1     Emily Senkosky was badly burned when her dress caught fire as she stood next to an open fire pit on Bistro 412 LLC's property. Senkosky sued Bistro 412, and the case proceeded to trial. The jury was instructed on two theories of negligence: ordinary negligence and premises liability. The trial court also adopted, over Senkosky's objections, a special verdict form proffered by Bistro 412. The jury returned a verdict in favor of Bistro 412, and Senkosky moved for a new trial on the ground that the special verdict form misled the jury by preventing it from considering her ordinary negligence claim. The court denied her motion.

¶2     On appeal, Senkosky argues that the court abused its discretion when it adopted Bistro 412's special verdict form and when it denied her motion for a new trial. Because both theories of liability were closely linked due to the manner in which they were presented to the jury, any alleged error in the jury instructions was harmless, and we affirm on that basis.

BACKGROUND[1]

¶3     Bistro 412 was a restaurant in Park City. In early 2012, Bistro 412 installed an open fire pit on its outdoor deck. The owner of Bistro 412 explained that he installed the fire pit because similar fire pits had served as "a gathering point for people" throughout the city during the 2002 Olympics, and he hoped that a fire pit on Bistro 412's deck would draw people to the restaurant. Although the owner could not locate the exact model of fire pit installed throughout the city during the Olympics, he was able to find one that "was very similar, although smaller in diameter." Like the city's other fire pits, Bistro 412's fire pit was a bowl that held a natural gas generated fire and sat on a stone slab at knee level. Also like the city's other fire pits, it was made of iron or steel and did not have a barrier around it. And like the other fire pits around the city, Bistro 412's fire pit was unattended.

¶4     Prior to purchasing the fire pit, the owner brought pictures of the fire pit and its instructions to the Park City fire marshal. The fire marshal advised the owner to place two signs near the fire pit stating, "caution—hot open flame," but the fire marshal otherwise gave the "go ahead." The fire marshal did not require that a barrier be placed around the fire pit. The owner then had a licensed plumber install the fire pit and placed two warning signs on the front doors of the restaurant. Placement of the signs meant

_____

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 3, 82 P.3d 1064 (quotation simplified).

that only patrons with their backs to the fire pit could read them. Following the installation, the fire marshal inspected the fire pit and approved it, including the placement of the signs. Thereafter, the fire marshal inspected and approved the fire pit at least once a year.

¶5 One night in mid-March 2016, Senkosky, wearing a knee-length dress, visited Bistro 412 with friends. After Bistro 412's bar stopped serving drinks, Senkosky moved to the deck with several others. As she stood about one-to-two feet from the lit fire pit, which she considered to be "a safe distance," she looked down to see the hem of her dress on fire. She began patting at the flame and started to panic when she realized "it wasn't doing anything." As she quickly became "engulfed in flames," two nearby individuals put out the flames by tackling and laying on top of her.

¶6 Senkosky sustained burns to thirteen percent of her body, including third-degree burns,[2] primarily to her torso but also to her upper extremities. The burns caused significant scarring. She was hospitalized for over two weeks and endured approximately nine surgeries and twenty laser treatments between the time of her injury and trial.

¶7 Senkosky sued Bistro 412, bringing two causes of action: negligence and what she titled "Reckless—Punitive damages." As part of her negligence claim, she alleged that Bistro 412 "constructed, maintained and operated an open burning fire pit in violation of local permitting requirements and the Fire code" and that the fire pit was "in an unsafe location, without adequate

---

2. An expert witness testified at trial that third-degree burns are "the most serious type of burn" and occur when the skin "has completely been destroyed." He further explained that "[a]lmost all third-degree burns require a skin graft" to replace the missing skin.

warning and/or supervision." She claimed that Bistro 412 "knew or should have known that the open fire pit upon its premises presented an unreasonable risk of harm." The complaint further alleged that Bistro 412 "breached its duty of care including without limitation by such other acts of negligence as discovery may reveal."

¶8　The case proceeded to trial. In relevant part, Senkosky, the fire marshal, a fire expert, and two patrons of Bistro 412 testified as part of Senkosky's case-in-chief. While describing the incident, Senkosky testified, "I believed I was a safe distance away from the fire," at the time her dress caught fire. She later reiterated, "I don't believe I was standing too close to the fire," and she stated that she did not recall feeling heat radiate on her leg or any other part of her body as she stood next to the fire pit. She testified that, to her knowledge, the fire pit did not "malfunction in any way." Senkosky further testified that at the time of the incident, she worked at another establishment that also had a fire pit and that she had been trained to operate it. Her employer's fire pit was similar to that of Bistro 412's in that it was metal, round, and lower than waist height, but unlike the fire in Bistro 412's fire pit, the fire was "down within the pit."

¶9　The fire marshal testified that he issued a permit for the fire pit and later inspected it to confirm that the fire pit satisfied the applicable requirements. On cross-examination, the fire marshal stated that because the fire pit was "stationary," and not "portable," the permit did not require Bistro 412 to place a barrier around it or a screen on top of it. Instead, the permit instructed that "caution—hot flame" signs be placed near the fire pit, which the fire marshal confirmed had been done. He also confirmed that there was sufficient clearance for the fire pit on the deck and "[i]f the location had been improper in any way, [he] would not have permitted" its location. The fire marshal next explained that the manufacturer's instructions, under the heading "Selecting the Location," provided that combustible material cannot be kept

within 14 inches of the fire pit's burner, but that it did not necessarily mean that people's clothing had to be kept 14 inches away from the burner. The fire marshal also stated that there was nothing "different or unusual" about Bistro 412's fire pit as compared to the "thousands" of other fire pits throughout Park City. The fire marshal was also unaware of any fire pits in the city that kept an attendant nearby.

¶10 Senkosky's fire expert testified that it was unsafe for any person to be on the deck with the fire pit without a barrier. He also testified, based on his classification of the fire pit as a "portable fueled open flame device," that the city's fire code required the fire pit to "be enclosed or installed in such a manner as to prevent the flame from contacting combustible material." The expert interpreted the 14-inch clearance provision in the manufacturer's instructions to mean that there must be "a clear space between the edge of the fire pit to where something possibly combustible would be," including clothing. The fire expert further pointed to the instructions' directive: "Never leave an operating fire pit unattended or by someone not familiar with its operation or emergency shutoff locations." He concluded that the fire pit would have been safe if it had been placed in a location that allowed for enjoyment of the fire pit at a safe distance, had been attended, and had a 14-inch clearance around the fire pit.

¶11 The first of Bistro 412's patrons Senkosky called to testify noted that, on the night of the incident, no employee was near or watching the fire pit. He also stated that "in the 50 to 100 times" he visited Bistro 412, he never saw any warning signs near the fire pit. He testified that on the night in question, there were 25 to 30 people "shoulder to shoulder" on the deck, with Senkosky "standing just within arm's reach of me." He continued, "The next thing I knew, I could see flames coming up from about my knee level" and within seconds, Senkosky "was like the human torch." The patron then recounted that he pulled Senkosky to the ground and that he and another individual laid on top of her to extinguish

the flames. He also stated that he did not believe that the flame radiated much heat because, on dozens of occasions, he had "seen kids run across the top of the fire pit with their shoes on after the bar's closed" without their shoes melting.

¶12    A second patron testified about an incident that occurred a few months prior to Senkosky's injury. He stated that he had "gotten too close" to Bistro 412's fire pit and the arm of his "sweater was singed and smoking a little bit," leaving a 3-inch hole.

¶13    The owner testified on Bistro 412's behalf. He testified that he would place the fire pit on the deck in the fall and remove it in the spring. When the fire pit was in operation, Bistro 412's employees would turn it on and off. The owner stated that he never considered the fire pit to be unsafe and had no reason to believe otherwise because "it was a decorative flame." He had never heard of any prior incident of a patron being burned or nearly burned by the fire pit, and he had never received a complaint about it being unsafe. He stated that he believed that patrons would take reasonable precautions to protect themselves from the flame and that he was unaware of any prior incident that would have caused him to question that belief. The owner further testified that, to his knowledge, the fire pit had never malfunctioned.

¶14    At the close of evidence, the jury received four instructions on Senkosky's negligence claim: two on a premises liability theory and two on ordinary negligence. Instruction 28 asked the jury to decide "whether Bistro 412 used reasonable care to operate and maintain the open flame device" and listed the elements of premises liability. Instruction 28.5 provided that "Bistro 412 is not liable to . . . Senkosky for physical harm caused to her by any . . . activity or condition on the land if the danger was known or obvious to her, unless Bistro 412 should anticipate the harm despite such knowledge or obviousness." Instruction 29, among

other things, informed the jury that Senkosky was claiming that Bistro 412 was negligent for "fail[ing] to exercise reasonable care in the installation, operation and maintenance of the open flame devise on the outdoor patio." The instruction further provided that "[r]easonable care is simply what a reasonably careful person would do in a similar situation" and that, although "[o]rdinary circumstances do not require extraordinary caution," "some situations require more care because a reasonably careful person would understand that more danger is involved." Finally, Instruction 30, among other things, instructed that "[v]iolation of a safety law is evidence of negligence unless the violation is excused"; recited the relevant Park City fire code provisions; and stated that if the jury found that Bistro 412 had not violated the relevant safety laws, it must "decide whether Bistro 412 acted with reasonable care under the circumstances."

¶15 Both parties also proposed special verdict forms. The trial court rejected Senkosky's and adopted Bistro 412's proposed special verdict form, with a few minor adjustments. The first question of the adopted special verdict form asked, "Did Bistro 412's open flame device present an unreasonable risk of harm to its patrons?" If the jury answered "no" to this first question, it was instructed to simply sign the form and notify the court without proceeding to answer the remaining questions. Senkosky objected to the special verdict form, arguing that she had two separate causes of action—premises liability and ordinary negligence—and that the first question eliminated her ordinary negligence claim. Under Senkosky's proposed special verdict form, the first question asked, "Was Defendant Bistro 412 negligent?"

¶16 The jury answered "no" on the first question of the special verdict form submitted to it and, as instructed, notified the court it had reached a verdict without answering the remaining questions. Senkosky moved for a new trial, arguing, among other things, that the first question on the special verdict form was incorrect and misleading because it "did not allow [her]

negligence claim to be considered by the jury." Specifically, she argued that the question misleadingly focused "on whether or not a fire pit was allowed or reasonable to have at all" and ignored the actual "issue of whether a reasonable person, displaying a fire pit in its business to attract customers and create ambiance, would follow the manufacture safety warnings and instructions as well as the permitting instructions and local safety laws."

¶17 The trial court denied Senkosky's motion. It first noted that the claim titled "Negligence" in Senkosky's complaint "conflates two potential claims, one for premises liability and one for negligence, under a singular cause of action for negligence" and that the complaint "specifically alleges the 'unreasonable risk of harm' which is the subject of Question 1 in the Special Verdict Form." The court further stated that "[t]he evidence which [Senkosky] adduced at the trial focused strictly on the fire pit and her legal theory of premises liability stemming from the manner in which the fire pit was constructed and maintained by" Bistro 412 and that she "maintained throughout the trial that the liability for injuries in this case was caused by defective premises." The court also noted that Senkosky did not present evidence of "actions separate and distinct from the defective premises in order to maintain an independent negligence claim" in contemplation of the complaint's reference to "other acts of negligence as discovery may reveal." And even if Senkosky had alleged a separate claim for negligence in her complaint, the court stated that she still "would have had to address the duty element of" the ordinary negligence claim and "[t]he only duty presented to the jury arose in premises liability."

¶18 Lastly, the court held that, in any event, "[r]easonableness is the crux of both premises liability and negligence" and that here, the first question of the special verdict form "was a question of reasonableness, thus covering both premises liability and negligence."

¶19    Senkosky appeals.

ISSUES AND STANDARDS OF REVIEW

¶20    Senkosky first argues that the trial court erred in using the special verdict form proposed by Bistro 412. We review a trial court's decision to accept a proposed special verdict form for an abuse of discretion. *See Collins v. Wilson*, 1999 UT 56, ¶ 22, 984 P.2d 960 ("[A] court has considerable discretion in accepting proposed special verdict forms."). Additionally, "we will not reverse a judgment merely because there may have been error; reversal occurs only if the error is such that there is a reasonable likelihood that, in its absence, there would have been a result more favorable to the complaining party." *Trapnell & Assocs. v. Legacy Resorts, LLC*, 2020 UT 44, ¶ 62 n.8, 469 P.3d 989 (quotation simplified). *See* Utah R. Civ. P. 61.

¶21    Relatedly, Senkosky argues that the trial court erred in denying her motion for a new trial, which was premised on the alleged error in the special verdict form. Our review of a trial court's decision to grant or deny a motion for a new trial is two-fold. *See Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 30, 502 P.3d 320. First, we evaluate the trial court's determination of whether an error occurred that may require retrial. *Id.* ¶ 31. *See* Utah R. Civ. P. 59(a) (listing the seven grounds for which a new trial may be granted). If the asserted error "cannot be found to exist without some sort of factual determination on the part of the trial court," we afford deference to that court's determination. *Peterson*, 2021 UT App 128, ¶ 31. But if the asserted error does not require the trial court to make a factual determination, we review the court's ruling on whether an error occurred for correctness. *Id.* Second, we review the court's determination of whether the alleged error was harmful for an abuse of discretion. *Id.* ¶ 32. *See* Utah R. Civ. P. 61 (discussing harmless error).

ANALYSIS

¶22    A trial court may use a special verdict form so long as the form does not "mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *Summerill v. Shipley*, 890 P.2d 1042, 1044 (Utah Ct. App. 1995) (quotation simplified). Senkosky asserts that she raised two theories of negligence at trial, ordinary negligence and premises liability,[3] but that the special verdict form the trial court adopted effectively foreclosed the jury's consideration of her ordinary negligence theory.

¶23    A negligence claim requires the plaintiff to establish the following essential elements: "(1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Torrie v. Weber County*, 2013 UT 48, ¶ 9, 309 P.3d 216 (quotation simplified). As relevant to our case, the distinguishing feature between Senkosky's claim of ordinary negligence and her claim of premises liability is duty. But to prevail under either theory, Senkosky had to prove the specific duty and breach-of-duty elements corresponding to each claim.

¶24    "In negligence cases, a duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Jeffs ex rel. B.R. v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228 (quotation simplified). Under Senkosky's ordinary negligence theory, she had to prove at trial that Bistro 412 violated its "duty to exercise [reasonable] care when engaging in affirmative conduct that creates a risk of physical harm to

_____

3. Bistro 412 contends that "Senkosky did not properly plead an ordinary negligence cause of action in her Complaint." Because we affirm on other grounds, we need not reach the merits of this argument.

others." *See id.* ¶ 21. Specifically, under Senkosky's theory of the case, and as the jury was instructed, she had to prove that Bistro 412 "failed to exercise reasonable care in its 'installation, operation, and maintenance' of the fire pit."

¶25  To prevail on her premises liability theory, Senkosky had to prove that Bistro 412 violated the duty landowners owe to invitees on their property. In Utah, this duty is defined in sections 343 and 343A of the Second Restatement of Torts. *See Hale v. Beckstead*, 2005 UT 24, ¶¶ 7, 23, 116 P.3d 263. Only section 343, titled "Dangerous Conditions Known to or Discoverable by Possessor," is relevant to the case before us. *See* Restatement (Second) of Torts § 343 (Am. L. Inst. 1965). It provides that "[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if," the possessor

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Id.* In other words, "the law simply requires owners to take reasonable steps to protect invitees" by adequately warning the invitees of any conditions on their property that pose an unreasonable risk of harm.[4] *Hale*, 2005 UT 24, ¶ 30. It follows that

---

4. But "[w]here the danger is so obvious such that no warning is necessary to alert an invitee, the possessor of land is not required to give the warning anyway unless other circumstances . . . warrant." *Hale v. Beckstead*, 2005 UT 24, ¶ 30, 116 P.3d 263. *See generally* Restatement (Second) of Torts § 343A (Am. L. Inst. 1965) (discussing the "open and obvious danger" rule).

no such duty arises if a condition does not pose an unreasonable risk of harm, which was reflected in the first question of the special verdict form presented to the jury.

¶26 Senkosky argues that "under the instructions given to the jury, whether there was an 'unreasonable risk of harm' was relevant only to the jury's determination of whether Bistro 412 had a duty" under her theory of premises liability. She contends that the question was not relevant to her claim of ordinary negligence, i.e., "whether Bistro 412 had a duty as the operator of the fire pit to exercise reasonable care 'in the installation, operation, and maintenance' of the fire pit." Accordingly, she asserts that the trial court abused its discretion in adopting Bistro 412's proposed special verdict form (with minor adjustment) and in denying her motion for a new trial. She contends that the first question on the "special verdict form misled the jury by ending its deliberations after determining that Bistro 412 did not have a duty as a *premises owner* because the fire pit did not pose an 'unreasonable risk of harm.'"

¶27 But even assuming, without deciding, that the trial court exceeded its discretion in largely adopting Bistro 412's special verdict form, the error was harmless and the trial court therefore did not err in denying Senkosky's motion for a new trial.[5] *See Trapnell & Assocs. v. Legacy Resorts, LLC*, 2020 UT 44, ¶ 62 n.8, 469 P.3d 989 ("We will not reverse a judgment merely because there

---

5. Ordinarily, a trial court will conduct a harmless error analysis when ruling on a motion for a new trial, which analysis we then review for an abuse of discretion. *See supra* ¶ 21; *Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 32, 502 P.3d 320. But because the trial court denied Senkosky's motion for a new trial on the ground that there was no error in the special verdict form, we have no harmless error analysis to review on appeal. In any event, we conclude that any assumed error in the special verdict form was harmless.

may have been error; reversal occurs only if the error is such that there is a reasonable likelihood that, in its absence, there would have been a result more favorable to the complaining party.") (quotation simplified). *See* Utah R. Civ. P. 61. We are not convinced that there is a reasonable likelihood that Senkosky would have obtained a more favorable verdict at trial if the court had rejected Bistro 412's special verdict form. As discussed in more detail below, the theory of ordinary negligence that Senkosky presented to the jury also depended on the degree of danger the fire pit posed to others. Thus, because the jury determined that the fire pit and its surrounding conditions did not pose an unreasonable risk of harm to Bistro 412's patrons, it is not reasonably likely that the jury would have accepted her theory of ordinary negligence either.

¶28   As previously discussed, the duties owed under a premises liability theory and under an ordinary negligence theory are distinct. *See supra* ¶¶ 24–25. Senkosky correctly asserts that Bistro 412 had an independent duty to operate the fire pit in a reasonable manner, totally aside from the implications of the fire pit being located on its premises. But under the facts of this case, these duties were necessarily linked. For Senkosky to prevail on a theory of premises liability, the jury had to first conclude that the fire pit and the conditions surrounding it presented an unreasonable risk of harm to Bistro 412's patrons. And under her ordinary negligence claim, the jury would have had to find that Bistro 412 failed "to exercise [reasonable] care when engaging in affirmative conduct that creates a risk of physical harm to others." *Jeffs*, 2012 UT 11, ¶ 21.

¶29   In defining reasonable care as part of the ordinary negligence claim, Instruction 29, which Senkosky does not challenge on appeal, provided that "[r]easonable care is simply what a reasonably careful person would do in a similar situation," and the instruction noted that "some situations require more care because a reasonably careful person would understand that more

danger is involved." *See Meese v. Brigham Young Univ.*, 639 P.2d 720, 723 (Utah 1981) (stating that "[n]egligence is the failure to do what a reasonable and prudent person would have done under the circumstances" and that "in the exercise of ordinary care, the amount of caution required will vary in accordance with the nature of the act and the surrounding circumstances"); *Godesky v. Provo City Corp.*, 690 P.2d 541, 548 (Utah 1984) (stating that "the degree of care must be equal to the degree of danger involved"). Based on the manner in which this case was presented to the jury, then, whether Bistro 412 exercised reasonable care is dependent on the conditions of the fire pit and its placement on Bistro 412's deck.

¶30    Both at trial and on appeal, in support of her assertion that Bistro 412 breached its duty to exercise reasonable care as the operator of the fire pit, Senkosky points to the manufacturer's instructions that provided, "Never leave an operating fire pit unattended or by someone not familiar with its operation or emergency shutoff locations" and to testimony that the fire pit was unattended at the time of her injury. She asserts that this "gave the jury a basis for concluding that a reasonable operator of a fire would have an attendant present while actively operating a fire." And to counter the owner's and the fire marshal's testimony that the other fire pits throughout Park City likewise did not have attendants, Senkosky argues that "there was ample evidence for the jury to conclude that a reasonable careful person would have had an attendant present while actively operating the fire pit under the particular circumstances present here." Specifically, the jury heard evidence that Bistro 412 failed to display warning signs (although the jury heard evidence to the contrary from the fire marshal and the owner); that the knee-level fire pit was located on a relatively small deck on which crowds of people would gather to socialize; that the fire pit was unattended and did not have a barrier around it; and that the fire pit did not emit sufficient heat to encourage patrons to keep their distance.

¶31    This argument demonstrates how closely linked the premises liability and ordinary negligence claims were in this case. Senkosky did not present evidence that even one of the "thousands" of other fire pits operated by others throughout Park City had attendants on hand or other evidence that a reasonably prudent person would have followed the specific manufacturer's instruction regarding attendants. Instead, Senkosky relies on the circumstances surrounding the fire pit—i.e., the placement of a knee-high fire pit on a small deck without an attendant or barrier—in arguing that a reasonably prudent owner would have recognized that Bistro 412's fire pit posed a greater danger to invitees than the other similar fire pits and, based on this higher degree of danger, would have placed an attendant or installed a barrier around the fire pit. But this argument is effectively rejected by the jury's determination that the fire pit and its surroundings did not pose an unreasonable risk of harm to Bistro 412's patrons.

¶32    By answering "no" to the question, "Did Bistro 412's open flame device present an unreasonable risk of harm to its patrons?," the jury necessarily rejected Senkosky's argument that the level of reasonable care Bistro 412 owed to its patrons was greater than that of other operators of similar fire pits throughout the city. And because Senkosky did not present evidence that reasonably prudent operators of fire pits similar to the one at issue here would have placed attendants at or barriers around their fire pits, we are not convinced that there is a reasonable likelihood that Senkosky would have obtained a more favorable outcome if the trial court had rejected Bistro 412's special verdict form or granted a new trial on the ground that the special verdict form was flawed.


CONCLUSION

¶33    Senkosky's claims for premises liability and ordinary negligence were closely intertwined based on the facts of this case and the manner in which the case was tried. For this reason, even

assuming the trial court erred in adopting Bistro 412's proposed special verdict form, such error was harmless and did not warrant a new trial.

¶34　Affirmed.

————————