**2023 UT App 146**

## THE UTAH COURT OF APPEALS

METROPOLITAN WATER DISTRICT OF SALT LAKE & SANDY,
Appellant,
*v.*
ZDENEK SORF,
Appellee.

Opinion
No. 20220025-CA
Filed December 7, 2023

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 100921025

Shawn E. Draney, Scott H. Martin, Danica N.
Cepernich, and Nathanael J. Mitchell,
Attorneys for Appellant

Paul M. Belnap and S. Spencer Brown,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

HARRIS, Judge:

¶1 The Metropolitan Water District of Salt Lake & Sandy (the District) operates the Salt Lake Aqueduct (the Pipeline), a forty-two-mile pipeline that provides culinary water for use in the Salt Lake Valley. Part of the Pipeline runs underneath Zdenek Sorf's backyard. The District owns a 125-foot-wide easement (Easement)—acquired by warranty deed—over Sorf's land for the purpose of operating and maintaining the Pipeline.

¶2 In 2009, Sorf installed improvements (Improvements) in his backyard, including a shed, a hot tub, a deck, and landscaping

features. Some of the Improvements, in whole or in part, are located within the Easement. In 2010, the District sued Sorf, alleging that his Improvements unreasonably interfered with the District's use (or potential use) of the Easement, and asked the trial court for, among other things, injunctive and declaratory relief compelling Sorf to remove the Improvements.

¶3      After a trial, a jury determined that Sorf's Improvements did not unreasonably interfere with the District's use and enjoyment of the Easement. Following the verdict, the trial court entered judgment in favor of Sorf. The District appeals, asserting that the court improperly instructed the jury and improperly allowed testimony from Sorf's expert witness. In particular, the District asks us to adopt a bright-line legal rule that the placement of any permanent structure inside an easement of definite dimensions conveyed by grant is unreasonable as a matter of law. We decline the District's invitation to adopt such a legal rule in this case, reject the District's remaining arguments, and therefore affirm the judgment.

BACKGROUND

¶4      The District is a governmental entity that provides water to many of the cities in the Salt Lake Valley. Between 1939 and 1951, the District constructed the Pipeline, which runs for approximately forty-two miles, mostly underground, from Deer Creek Reservoir near the top of Provo Canyon to a terminal storage reservoir near the mouth of Parleys Canyon. The Pipeline is made of steel (in some sections) and reinforced concrete (in others) and is large enough for an average-sized person to walk upright inside it: the Pipeline has a sixty-nine-inch inside diameter and an eighty-four-inch outside diameter. The concrete part of the Pipeline consists of a series of twenty-foot-long sections, with each one weighing about twenty tons. The Pipeline plays an important role in supplying adequate culinary water for the large and growing population of the Salt Lake Valley. During

most of the summer, the Pipeline runs at its maximum capacity, transporting about 113 million gallons of water per day.

¶5 The strip of land under (or over) which the Pipeline runs is known as the SLA Corridor. Parts of the real property comprising the SLA Corridor are owned by the District outright. But other parts are owned by third parties, and in those sections the District holds easements over the land; those easements allow the District to use the SLA Corridor as necessary to operate and maintain the Pipeline. In 1946, the District acquired—by warranty deed and for good and valuable consideration—the Easement over the property currently owned by Sorf. Under its specific terms, the Easement allows the District "to construct, reconstruct, operate and maintain a pipeline or pipelines on, over and across" Sorf's property. The deed describes with particularity the metes and bounds of the Easement: as relevant here, the Easement is 125 feet wide for most of its length and passes through Sorf's backyard.[1] As it passes through Sorf's property, the Pipeline is buried about eight feet underground, and is located off-center, some fifty feet from the Easement's eastern boundary and some seventy-five feet from its western boundary.

¶6 Sorf purchased his property in 1988, and at the time found the backyard to be "a mess" with "a bunch of trees and brushes." Starting in 2009, Sorf began the process of improving his backyard, and he removed many of the trees and other vegetation that had been there since his acquisition. More significantly for present purposes, Sorf also constructed or installed the

---

1. On Sorf's property, the Easement was originally entirely contained within Sorf's backyard, with one exception: one corner of Sorf's house encroached some two to four feet into the easement corridor. However, the District later abandoned the part of the Easement that ran through Sorf's house; thus, at present, the Easement in that spot is not quite 125 feet wide. Currently, then, the entire Easement is located in Sorf's backyard.

Improvements in his backyard, including a covered deck with a hot tub, a larger uncovered deck, a "small shed on concrete blocks," a "Tuff Shed barn" with a "concrete slab" underneath and around it, a "pond and water feature," a decorative rock wall, and a "rock retaining wall."[2] The Improvements are located, in whole or in part, inside the 125-foot-wide Easement. Some of them are located on the margins of the Easement, some distance from the Pipeline, but others are located closer to the center of the Easement, near the Pipeline's location. All the Improvements are located at least nineteen feet from the center line of the Pipeline, except for one section of the decorative rock wall that runs perpendicular to the Pipeline and crosses it at one point. A visual depiction of these Improvements and their proximity to the Pipeline is included in an appendix to this opinion.

¶7 When the District learned of Sorf's Improvements, it informed Sorf that he needed permission from the District to build them, which permission the District later denied. Despite the District's disapproval, Sorf continued with installation of the Improvements, and the District responded in October 2010 by filing this lawsuit. In the suit, the District alleged that Sorf's Improvements unreasonably interfered with the District's use and enjoyment of the Easement.[3] Sorf failed to timely respond to the

---

2. The project also included upgrading the gates, one on each end of Sorf's property, by which the backyard could be accessed. The new gates are large enough to accommodate construction trucks. Following completion of the project, Sorf provided the District with codes to the gates, and the District has used those gates to access Sorf's property on several occasions.

3. The District also asserted that the Improvements violated certain regulations, enacted by the District itself, that it believed governed the conduct of property owners whose land was subject to District easements. But the District voluntarily dismissed that

(continued…)

complaint, and default judgment was entered against him. But in this case's first trip to the appellate courts, our supreme court set aside that default judgment and remanded the case to the trial court for further proceedings. *See Metropolitan Water Dist. of Salt Lake & Sandy v. Sorf*, 2013 UT 27, ¶ 26, 304 P.3d 824.

¶8     After remand, Sorf filed a motion for summary judgment asserting that the District's easement-interference claims were not ripe for adjudication because the District did not have any current plans to refurbish or replace the Pipeline. The trial court granted Sorf's motion, noting that the Pipeline "is in good shape and all indications are that it will not need to be accessed for reconstruction or maintenance for at least the next 10-15 years," and that therefore "no actual or imminent clash of legal rights related to the [E]asement" was before the court. In this case's second trip to the appellate courts, our supreme court again reversed, concluding that there was a justiciable question about whether Sorf's Improvements "encroach upon [the District's] property rights" and about whether Sorf "has unreasonably interfered with" the District's Easement. *See Metropolitan Water Dist. of Salt Lake & Sandy v. Sorf*, 2019 UT 23, ¶ 12, 445 P.3d 443. Specifically, the court stated that "the question left unanswered . . . is whether [Sorf's Improvements] have interfered with [the District's] present right to access the [Pipeline] through its [E]asement, for the purposes of ongoing maintenance." *Id.*

¶9     Following the second remand, the case proceeded toward trial. In the weeks leading up to trial, the District submitted proposed jury instructions and a proposed special verdict form, several aspects of which are relevant to this appeal. First, the District asked the trial court to instruct the jury that any

---

portion of its lawsuit following our supreme court's ruling that the District did not have the power to enact such regulations. *See Metropolitan Water Dist. of Salt Lake & Sandy v. SHCH Alaska Trust*, 2019 UT 62, ¶ 11, 452 P.3d 1158.

"permanent structure located within an easement of definite location and dimensions is unreasonable" as a matter of law. The court refused to give the instruction, offering its view that the proposed instruction did not reflect current Utah law.

¶10    Second, the District asked the trial court to give the following jury instructions regarding Sorf's and the District's respective obligations regarding the Easement:

> Actions and things that make it more difficult for the owner of an easement to use the easement, that interfere with the ability to maintain and repair improvements built for use of the easement, or that make using the easement more risky are considered to be unreasonable interferences that are not allowed.
>
> When deciding whether Mr. Sorf's [I]mprovements unreasonably interfere with the District's use of its [E]asement or not, you should consider the character of the [I]mprovements and the likelihood that they will make future use of the [E]asement more difficult. If [an] improvement is temporary and easily removed, it is generally not unreasonable. The more expensive the improvement is or the more difficult it likely is to remove, the more likely it is that the improvement is an unreasonable interference with the [E]asement.

And,

> In using its [E]asement for the repair, replacement, and reconstruction of the [Pipeline], the District has the right to use the full width of its [E]asement. The District does not need to establish that the full width is necessary or reasonably necessary for its use. It also is not required to use a very expensive or

unusual method because Mr. Sorf prefers it or because that method would be slightly less burdensome to Mr. Sorf's property.

¶11 The trial court refused to give these instructions in precisely the form suggested by the District. Instead, the court instructed the jury as follows:

> When deciding whether Mr. Sorf's [I]mprovements unreasonably interfere[] with the District's use of its [E]asement or not, you may consider the nature and character of the [I]mprovements within the [E]asement.
>
> The District as the [E]asement owner, can use its [E]asement for the repair, replacement and reconstruction of the [Pipeline] so long as it does not unreasonably interfere with Mr. Sorf's reasonable use of his property within the [E]asement. When deciding whether the District's use of its [E]asement unreasonably interferes with Mr. Sorf's use of his property or not, you may consider the nature, character and method to be used for the repair, replacement, and reconstruction of the [Pipeline].
>
> The District can use up to the full width of its [E]asement for the repair, replacement, and reconstruction of the [Pipeline] in any particular method it chooses so long as the District does not unreasonably interfere with Mr. Sorf's reasonable use of his property.
>
> You must determine whether Mr. Sorf's [I]mprovements to his property located within the District's [E]asement unreasonably interfere with the District's use of its [E]asement to construct, reconstruct, operate, and maintain the [Pipeline].

¶12    Third, the District asked the court to utilize a special verdict form that asked the jury some version of this question: "Do any of Mr. Sorf's [I]mprovements, *whether individually or taken together*, unreasonably interfere with the District's [E]asement?" (Emphasis added.) Sorf objected, arguing that asking about cumulative effect would be "utterly unworkable in practice" because, at the end of the trial, the court should "be able to tell exactly what, if anything, the jury finds to be an unreasonable interference so that, if necessary, it can fashion an appropriate remedy." The court declined to ask the jury about any cumulative effect of the Improvements, reasoning that "the jury needs to decide on which individual [I]mprovements they . . . consider to be a problem." Thus, the special verdict form ultimately given to the jury contained ten separate questions, each asking about one of (or one grouping of) Sorf's Improvements, but did not contain a question asking whether the combined effect of all those Improvements, taken together, constituted unreasonable interference with the District's easement rights.

¶13    In addition to these requests regarding the jury instructions and special verdict form, the District made one other relevant pretrial request: it asked the trial court to prevent Sorf's expert witness, a geotechnical engineer (Engineer), from offering any testimony about what sorts of uses might be "reasonably necessary" for the District to employ on the Easement. The court denied the District's motion, determining that Engineer could provide evidence on whether the District was using, or planned to use, the Easement "in a way that does not unreasonably interfere with the property rights of the owner of the land."

¶14    The jury trial lasted four days. It included a site visit to Sorf's property so that the jurors could see for themselves what the Improvements looked like and how they were located in Sorf's backyard. And it included another site visit to view a segment of the pipe used for the Pipeline. The jury also saw many pictures, videos, and diagrams of Sorf's property.

¶15    In addition, the jury heard testimony from three witnesses: a prior manager of the Pipeline (Manager), Engineer, and Sorf himself. The District first called Sorf to testify about the nature and location of the Improvements. During this initial testimony (as well as later testimony during his own case-in-chief), Sorf testified that all the Improvements could be moved if necessary to facilitate repairs or maintenance of the Pipeline. He testified that he had no intention of getting in the District's way if it needed to utilize his property for purposes of maintaining the Pipeline, and that if any of the Improvements turned out to be "in the way" at a later time, he would "remove them" upon request.

¶16    The District next called Manager, who testified about the history and use of the Pipeline. Manager explained that the District was created in 1935, and that construction of the Pipeline began in the late 1930s but was not fully completed until 1951. The Pipeline was anticipated to have about a one-hundred-year useful life, but Manager testified that it is "aging gracefully" and that recent inspections—carried out by having an inspector walk through the inside of the Pipeline—have revealed that the Pipeline "is actually in . . . good shape . . . as it ages." At some point, however, the District will need to replace or rehabilitate the Pipeline, a project that the District anticipates will begin in the "late 2030s to 2040."

¶17    During his direct examination, Manager discussed three options that the District is considering for replacing or rehabilitating the Pipeline: reconstructing the Pipeline in its existing location, constructing an entirely new pipeline next to the existing one, or "slip-lining"[4] the Pipeline in its existing location. The first two options—reconstructing the existing pipeline or constructing a new one parallel to the old one—would each require substantial excavation, though the particular amount of

---

4. Slip-lining entails inserting fiberglass material through the inside of the Pipeline that "lines the pipe" and rehabilitates it.

excavation would "depend[] upon the natural features that are involved" in various locations along the Pipeline's route. Manager believed that constructing a parallel pipeline was the most viable option. He did not believe that slip-lining was a viable option, because slip-lining would reduce the capacity of the Pipeline so that it "would not be able to deliver . . . water at the capacity that the member cities and others require." Manager acknowledged that, at present, the District does not "have any engineered plans for what option they're going to pick when the time comes to replace or rehabilitate" the Pipeline. According to Manager, "one of the driving factors would be value and doing the job as economically as possible."

¶18    Manager also discussed various excavation methods the District may use if it selects one of the first two options, and noted that the precise method used in any given location would ultimately be up to the contractor. Manager offered his view that, no matter the excavation method selected for Sorf's property, the "Improvements will make the operation for construction within that Easement more complex and more costly" because, in his view, the Improvements limit the District's ability to freely and easily access portions of the Easement with the necessary equipment, and they hinder the District's ability to place excavation material in convenient locations.

¶19    Manager also explained that the District inspects the Pipeline on a regular basis, every one to three years depending on the section. These inspections are done visually from the inside, and thus must occur—along with most necessary non-emergency repairs—during times (usually fall or winter) when the Pipeline is shut down. Because non-emergency repairs and inspections usually occur internally, the District does not need to enter upon the surface of Sorf's land to conduct them, and landowners like Sorf usually are not even aware that they are taking place. Even many emergency repairs can be taken care of internally, by shutting the Pipeline down and sending workers inside.

¶20 Sometimes, however, the District has had to conduct emergency repairs to the Pipeline that have necessitated excavation. While these occasions have been extremely rare so far—Manager could recall just two such occasions, neither of which affected Sorf's property—Manager offered his view that such repairs may become more common as the Pipeline ages.

¶21 Manager stated that for any planned (non-emergency) repairs or construction, the District has a "public involvement" process where it notifies property owners well in advance. If the District decides to replace or reconstruct the entire Pipeline, the project would likely take more than twenty years to complete, and during the construction period there would be "sequencing and staging" during which affected landowners would be notified well in advance "as the project approached."

¶22 During cross-examination of Manager, Sorf's counsel posited that building a new pipeline next to the old one would be far more expensive than certain other options, and Manager acknowledged that, according to recent studies, replacing the Pipeline would cost $200 to $300 million, while slip-lining the Pipeline could potentially be accomplished for around $15 million and yet another method of extending the Pipeline's lifespan—treating joints with a mechanical joint treatment—would only cost around $8 million. Manager acknowledged that the joint-treatment method is "one of the options that's continuing to be considered" and that it "would be an economical approach." Sorf's counsel also pointed to a study that refuted Manager's position on loss of capacity from slip-lining because any loss of capacity is "offset by a decrease in the internal friction loss" so that "the hydraulic capacity of the pipe is not reduced."

¶23 Manager also testified that the District has developed a practice of allowing existing trees to remain in place if they are at least twenty feet away from the center of the Pipeline, so that a forty-foot corridor is available for potential excavations. The two

emergency repairs that required excavation were both accomplished within this forty-foot range. But Manager was not able to say that all repairs could be done within that range. Sorf's counsel pointed out—and Manager acknowledged—that most of the Improvements were outside of this forty-foot area (the exceptions being the decorative rock wall and one small section of the rock retaining wall) and many were significantly outside it.

¶24 Finally, Sorf called Engineer to testify about how—based on the efficacy and cost of current engineering and excavation techniques, as well as the geology of Sorf's property—the District would be likely to proceed should excavation become necessary in Sorf's backyard. Engineer testified that Sorf's Improvements were very unlikely to materially interfere with any excavation the District was likely to conduct. As an initial matter, Engineer testified that the joint-treatment option would not require any excavation at all—and was therefore "much cheaper"—yet would likely extend the life of the Pipeline by "25 to 50 years." But he also testified that, even if the District did someday see a need to excavate the Pipeline on Sorf's property, any such excavation would likely be conducted through a "vertical trench" that would only be about fifteen feet wide, and he offered his view that "there's enough space to get equipment in there . . . without doing significant demolition or movement of" the Improvements. And he testified that, even if it somehow became necessary to remove the Improvements in order to facilitate District activity on the property, removing them "wouldn't be difficult at all." Overall, Engineer opined that none of Sorf's Improvements "unreasonably interfere with the District's ability to access" the Pipeline.

¶25 After deliberation, the jury answered each of the ten questions on the special verdict form in the negative: in its view, none of the ten individual (or groups of) Improvements unreasonably interfered with the District's use and enjoyment of the Easement. A few weeks later, based on the jury's verdict, the trial court entered judgment in favor of Sorf.

ISSUES AND STANDARDS OF REVIEW

¶26　The District now appeals, raising several issues for our consideration. First, it claims that the court made certain errors when it instructed the jury. We review a trial court's "refusal to give a jury instruction for abuse of discretion." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13 & n.1, 285 P.3d 1208. But if the court made a legal error in its instructions, we do not defer to the court's ruling. *See id.* (stating that "an error of law always constitutes an abuse of discretion"); *see also State v. Eyre*, 2021 UT 45, ¶ 13, 500 P.3d 776 ("Claims of erroneous jury instructions present questions of law that we review for correctness." (quotation simplified)).

¶27　Next, the District challenges the court's refusal to ask the jury, on the verdict form, about the cumulative effect of Sorf's Improvements. "We review a trial court's decision to accept a proposed special verdict form for an abuse of discretion" and "we will not reverse a judgment merely because there may have been error" in that regard; indeed, "reversal occurs only if the error is such that there is a reasonable likelihood that, in its absence, there would have been a result more favorable to the complaining party." *Senkosky v. Bistro 412 LLC*, 2022 UT App 58, ¶ 20, 512 P.3d 477 (quotation simplified).

¶28　Finally, the District claims that the court erred by not limiting Engineer's testimony. "Two different standards of review apply to claims regarding the admissibility of evidence." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 41, 513 P.3d 729 (quotation simplified). We review for correctness any "legal questions underlying the admissibility of evidence," but we review for abuse of discretion any decisions "to admit or exclude evidence and . . . determinations regarding the admissibility of expert testimony." *Id.* (quotation simplified); *see also State v. Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133 ("Trial courts have considerable discretion in determining the admissibility of expert

testimony, and such decisions are reviewed under an abuse of discretion standard." (quotation simplified)).

ANALYSIS

¶29    We first examine the District's arguments regarding the trial court's jury instructions. Next, we address the District's challenge to the special verdict form the court provided to the jury. And finally, we assess the District's arguments regarding the court's refusal to limit Engineer's testimony.

## I. Jury Instructions

¶30    With regard to jury instructions, the District raises two issues. First, it asserts that the court should have instructed the jury that the placement of any permanent structure inside an easement of definite dimensions conveyed by grant is unreasonable as a matter of law. Second, it claims that the court's instructions regarding the parties' mutual obligation not to unreasonably interfere with the other's use of the land within the Easement were incomplete, inaccurate, and misleading. For the following reasons, we reject these arguments.

### A

¶31    Utah law regarding easements has long been characterized by the principle that "the owners of the dominant and servient estates must exercise their rights so as not unreasonably to interfere with the other." *Metropolitan Water Dist. of Salt Lake & Sandy v. Questar Gas Co.*, 2015 UT App 265, ¶ 30, 361 P.3d 709 (quotation simplified), *cert. denied*, 369 P.3d 451 (Utah 2016); *accord McBride v. McBride*, 581 P.2d 996, 997 (Utah 1978); *North Union Canal Co. v. Newell*, 550 P.2d 178, 179 (Utah 1976); *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 158 (Utah 1946); *see also* Restatement (Third) of Property: Servitudes § 4.9 (Am. L. Inst. 2000) (stating that "the holder of the servient estate is entitled to

make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude"). Our supreme court recently summed up the current state of the law:

> Under Utah's property law, an easement holder has the right to use its easement (the scope of which defines the extent of the permitted use) in a way that does not unreasonably interfere with the property rights of the owner of the land. And the owner of the land has the right to continue using its land so long as it does not unreasonably interfere with the easement holder's use of its easement.

*Metropolitan Water Dist. of Salt Lake & Sandy v. SHCH Alaska Trust*, 2019 UT 62, ¶ 49, 452 P.3d 1158.

¶32   This rule of mutual reasonableness has been applied, under Utah law, to prescriptive easements, *see, e.g.*, *McBride*, 581 P.2d at 996–97, as well as to easements of specific dimension that are conveyed by grant, *see, e.g.*, *Metropolitan Water Dist. of Salt Lake & Sandy v. Sorf*, 2019 UT 23, ¶¶ 12–13, 445 P.3d 443. The rule is motivated by "public policy favoring socially productive use of land," and is aimed at "striking a balance that maximizes the aggregate utility of the servitude and the servient estate." *See* Restatement (Third) of Property: Servitudes § 4.9 cmt. b; *see also* 28A C.J.S. Easements § 191 (2023) ("The ownership of property that is subject to an easement creates a dichotomy of real property interests, each of which must be respected, and these interests must be kept in balance, to the extent possible."). Indeed, our supreme court has observed that "the object to be desired is to find some accommodation of [the] conflicting interests, to the maximum advantage and to the minimum disadvantage, of both parties." *North Union Canal Co.*, 550 P.2d at 180.

¶33   As a general matter, "[w]hether one party's conduct interferes with the right of the other is a factual question, the answer to which depends on the particular circumstances of the

parties and the nature of the easement." *SHCH Alaska Trust*, 2019 UT 62, ¶ 49; *see also Big Cottonwood Tanner Ditch Co.*, 174 P.2d at 159 (stating that, in easement cases, reasonable use "is a question of fact to be decided after considering" the circumstances of the case). And factual questions are typically not decided as a matter of law, unless the evidence in the case at hand is so one-sided that a reasonable factfinder could reach only one conclusion. *See Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 29, 474 P.3d 481 (stating that "even questions of fact may be decided as a matter of law" when the evidence "is so one-sided that a reasonable factfinder could reach but one conclusion").

¶34　The District acknowledges that "Utah has adopted an unreasonableness framework for assessing whether use of a servient estate unlawfully interferes with the rights of an easement holder," and it insists that it is not asking us "to eliminate that framework." Nevertheless, it contends that Utah law should include a bright-line "exception" to the mutual reasonableness rule that would potentially apply in a "narrow class of cases": those involving a negotiated and agreed-upon grant in which the metes and bounds of the easement are clear and are part of the bargain. The District maintains that, in cases involving this sort of easement, the better rule is to classify as per se unreasonable the construction of any "permanent" structure within the boundaries of the negotiated easement. In keeping with its view of the law, it asked the trial court to adopt this bright-line rule and instruct the jury that any "permanent structure located within an easement of definite location and dimensions is unreasonable" as a matter of law. The court refused to give the instruction, because it viewed the instruction as being at odds with current Utah law.

¶35　The bright-line rule advocated by the District has been adopted—at least in the context of ingress/egress easements—in a number of other jurisdictions. *See, e.g.*, *Johnson v. Highway 101*

*Invs., LLC*, 319 P.3d 485, 487–88 (Idaho 2014) (compiling cases); *see also* 25 Am. Jur. 2d *Easements and Licenses* § 76 (2023) ("A permanent physical obstruction placed in an express easement created by grant, in the absence of an agreement or surrounding circumstances to the contrary, interferes as a matter of law with the dominant easement holder's right to the use of all of the express easement.").[5] As justification for adopting this bright-line

---

5. The District characterizes the bright-line rule adopted in *Johnson v. Highway 101 Investments, LLC*, 319 P.3d 485 (Idaho 2014), as having been adopted by "a majority of other states." The District's characterization comes from *Johnson* itself, in which the Idaho Supreme Court stated that "[a] majority of our sister states recognize a caveat to the general rule of reasonableness" in cases involving permanent structures being built inside the boundaries of a negotiated easement. *Id.* at 487. Sorf resists this characterization, arguing that several of the cases that the *Johnson* court cites as support for the proposition do not actually adopt the rule. Based on our own canvass of the case law, we are not convinced that labeling the District's concept as a "majority" rule is necessarily accurate; the number of jurisdictions that have adopted the rule appears to us to be roughly equal to the number of jurisdictions that have rejected it or declined to apply it. *Compare Squaw Peak Cmty. Covenant Church of Phoenix v. Anozira Dev., Inc.*, 719 P.2d 295, 299 (Ariz. Ct. App. 1986); *Sand Lake Shoppes Family Ltd. P'ship v. Sand Lake Courtyards, LC*, 816 So. 2d 143, 145–46 (Fla. Dist. Ct. App. 2002); *Consolidated Amusement Co., Ltd. v. Waikiki Bus. Plaza, Inc.*, 719 P.2d 1119, 1123 (Haw. Ct. App. 1986); *Johnson*, 319 P.3d at 487; *Aladdin Petroleum Corp. v. Gold Crown Props., Inc.*, 561 P.2d 818, 822 (Kan. 1977); *Miller v. Kirkpatrick*, 833 A.2d 536, 547 (Md. 2003); *Xanadu Horizontal Prop. Regime v. Ocean Walk Horizontal Prop. Regime*, 410 S.E.2d 580, 581 (S.C. Ct. App. 1991); *Lamb v. Wyoming Game & Fish Comm'n*, 985 P.2d 433, 437–38 (Wyo. 1999), *with Skow v. Goforth*, 618 N.W.2d 275, 278–81 (Iowa 2000); *Mill Pond Condo. Ass'n v. Manalio*, 910 A.2d 392, 395 (Me.

(continued…)

---

approach, courts have posited that it "will avoid costly and time-consuming litigation concerning whether the servient estate owner's use of the easement area is reasonable," *see Johnson*, 319 P.3d at 488, and have reasoned that a contrary rule would give dominant estate owners "license to retake the easements in a piecemeal fashion," *see Lamb v. Wyoming Game & Fish Comm'n*, 985 P.2d 433, 438 (Wyo. 1999).

¶36    Other courts, however, have expressly declined to adopt this bright-line exception to the rule of mutual reasonableness. *See, e.g.*, *Skow v. Goforth*, 618 N.W.2d 275, 278–81 (Iowa 2000). These courts have emphasized the "aggregate utility" that the rule of mutual reasonableness promotes, *see id.* at 280 (quotation simplified), and they have noted the absurdity of a rule that would require a servient estate owner to remove a structure that encroaches on the easement in only a de minimis manner, *see id.* at 281, or that is located in a part of the easement that is entirely "unused" by the dominant estate holder, *see D'Abbracci v. Shaw-Bastian*, 117 P.3d 1032, 1041 (Or. Ct. App. 2005).

¶37    The two sides of this debate were presented by the majority and dissenting opinions in *Johnson*. *See* 319 P.3d at 485. In that case, the dominant estate holder had an express easement over certain property for the purpose of ingress and egress. *Id.* at 486. The servient estate holder erected a billboard within the easement

---

2006); *Gaw v. Seldon*, 85 So. 3d 312, 317 (Miss. Ct. App. 2012); *Baum v. Glen Park Props.*, 660 S.W.2d 723, 726 (Mo. Ct. App. 1983); *D'Abbracci v. Shaw-Bastian*, 117 P.3d 1032, 1041 (Or. Ct. App. 2005); *DeHaven v. Hall*, 753 N.W.2d 429, 439–40 (S.D. 2008). But in any event, our supreme court has noted that "the persuasiveness of authority is not determined by the pound, but by the quality of the analysis," *Pleasant Grove City v. Terry*, 2020 UT 69, ¶ 29, 478 P.3d 1026 (quotation simplified), and, in these circumstances, we consider it more or less irrelevant whether the rule for which the District advocates is or is not a "majority" rule.

boundaries; construction of the billboard involved digging holes for a "sign-post and two bollards," and when completed, the billboard itself was located "fourteen feet above the ground." *Id.* Testimony provided to the trial court indicated that "the sign did not prevent" the dominant estate holders, "or their customers, from accessing" the property. *Id.* Yet the Idaho Supreme Court adopted the bright-line rule and held that the billboard was "per se unreasonable," even though there was little evidence that it hindered the dominant estate holder's use of the easement. *Id.* at 489. The court offered its view that the bright-line rule "best recognizes the sanctity of a dominant owner's bargained-for property rights," and would—in the long run—"avoid costly and time-consuming litigation" about reasonableness. *Id.* at 488. The court recognized the "overall societal utility" of the flexible rule of mutual reasonableness, but it concluded that "the protracted and open-ended litigation invited by a rule of reasonableness offsets the slight societal utility benefits produced under a reasonableness standard." *Id.*

¶38 The dissenting opinion noted the senselessness of ordering the servient estate owner to tear down the billboard when it wasn't interfering at all with the dominant estate holder's use of the easement. *Id.* at 491 (Jones, J., dissenting) (stating that "[i]t is eminently unjust for a court to compel a servient owner to tear down a structure, perhaps at great expense, for no other reason than the dominant owner's caprice"). And it expressed doubt that the bright-line rule adopted by the majority would really reduce litigation, predicting that the focus of litigation would merely shift from whether an owner's use was "reasonable" to whether a particular structure was "permanent," an inquiry that itself may require importation of reasonableness principles. *Id.* at 490–91 ("After all, all permanent structures are removable; it is only a question of how difficult it is.").

¶39 The parties to this case present us with essentially the same question—supported by many of the same competing

arguments—that was presented to the court in *Johnson*. The District asks us to adopt, and import into Utah law, the bright-line exception to the rule of mutual reasonableness that the court adopted in *Johnson*. It asserts that the "clear standard" will "avoid costly and time-consuming litigation" over reasonableness, pointing to this case—which has been pending since 2010—as an example of how litigation over reasonableness can become protracted. Relatedly, it asserts that the concept of "reasonableness" can change over time as parties alter their usage of easement property, and it extols the virtues of a bright-line approach that would simply ban all permanent structures. The District also posits that the bright-line approach "best recognizes the sanctity of a dominant owner's bargained-for property rights," because it does not allow a servient owner to gradually chip away at the boundaries of a negotiated easement. Finally, it asserts that the bright-line approach makes even more sense in this case than in other cases, because this case involves "large-scale public infrastructure" that provides water to the Salt Lake Valley, and the rule would allow the District to continue to provide that important public service without becoming embroiled in "time-consuming, expensive litigation to assess the reasonableness of each improvement, property by property, along the entire length of the" SLA Corridor.

¶40   Sorf takes a different view, and asks us to decline the District's invitation to modify the rule of mutual reasonableness. He first notes that our supreme court has long adhered to that rule, without exception, and has never even hinted at adoption of this kind of bright-line addendum. He also points out that the cases that have adopted the bright-line exception have done so in the context of ingress/egress easements, and he asserts that adoption of the bright-line exception outside that context would be novel and would create additional complications. He emphasizes the social utility of the rule of mutual reasonableness, which allows both interest holders to maximize the use of the property in question, and he argues that these principles apply

squarely here, where the jury found that Sorf's Improvements do not unreasonably interfere with the District's use of the Easement. And he asserts that adoption of the bright-line approach the District advocates would do nothing to reduce overall litigation or to promote certainty, because "the subject of lawsuits would just turn to what is permanent." On that point, Sorf notes that all of his Improvements are removable, most fairly easily, and that he has offered to quickly remove them if removal were ever needed to accommodate the District's use of the Easement. Finally, he asserts that adoption of the bright-line rule would violate his property rights, given that he purchased his property at a time when no such rule existed in Utah.

¶41 On balance, Sorf has the better of the argument, at least on the facts of this case, for several reasons. First, we agree with Sorf's assessment of the current state of Utah law: our supreme court has long followed the rule of mutual reasonableness, and its cases do not contain any language potentially supportive of a bright-line exception as advocated by the District. *See SHCH Alaska Trust*, 2019 UT 62, ¶¶ 49–50 (expressing the rule of mutual reasonableness, without exception, and referring to the inquiry as "a fact-heavy question"); *North Union Canal Co.*, 550 P.2d at 179 ("*Whenever* there is ownership of property subject to an easement there is a dichotomy of interests, both of which must be respected and kept in balance." (emphasis added)); *Big Cottonwood Tanner Ditch Co.*, 174 P.2d at 158–59 (stating that "[e]ach owner must exercise his rights so as not unreasonably to interfere with the other," and that the question of whether a particular use is reasonable "is a question of fact to be decided after considering" all the "facts and circumstances bearing on the question"). We take the District's point that these cases do not necessarily "foreclose adoption of a bright-line rule for a particular set of circumstances within the general framework," but we note the relatively strong language used in these cases and find it at least somewhat instructive that our supreme court has always unambiguously followed the rule of mutual reasonableness.

¶42    Second, as far as we are aware, all the courts to have adopted the bright-line rule have done so in the context of ingress/egress easements. *See, e.g.*, *Johnson*, 319 P.3d at 487–89. Indeed, the District has not brought to our attention any cases adopting the bright-line approach outside of that context. This case, of course, does not involve an easement for ingress and egress; it involves an easement for an underground water pipeline. Thus, the District is urging us to adopt the bright-line rule in a context in which it has never before been applied.

¶43    We are hesitant to do so. In our view, the reasons justifying adoption of the bright-line rule are more applicable—and more apparent—in the ingress/egress context than they are here. A permanent structure built within the boundaries of an easement is likely to have a negative impact on a dominant owner's ability to use the easement for ingress and egress; after all, it is not possible to drive a car through a building. Only in cases involving de minimis encroachment, or encroachment on a completely unused part of the easement, can it be argued that a permanent structure built within the easement has no impact on ingress and egress. Thus, in a context in which many, if not most, permanent structures built within an easement are going to be problematic, it may make sense to adopt a bright-line rule declaring all such structures unreasonable per se. Such a rule would negatively affect servient owners in the de minimis cases, but—assuming that those cases are the rarer ones—there may be some measure of collective societal efficiency to be gained by adopting the bright-line rule in that context.

¶44    But in the context of an underground pipeline easement, we do not see that there are measurable collective efficiencies to be gained by adoption of the bright-line rule. The District does not use Sorf's property for ingress and egress. Nearly all the use to which the District puts that property occurs some eight feet underground, without any perceptible effect on the surface. In this context, it is far from self-evident that permanent structures

built on the surface of the Easement will be likely to negatively affect the District's use of the Easement. In fact, given that the District has only had to excavate a servient owner's property for emergency repairs of the Pipeline just a handful of times, it appears unlikely that any single surface-level obstruction will ever have any actual negative impact on the District's ability to maintain the Pipeline. Adopting the District's bright-line rule in this context would seem to turn the societal efficiency dynamics—the ones used by our supreme court to justify the rule of mutual reasonableness—on their head. It is not apparent to us how, in an underground pipeline context, the benefits of a bright-line rule would clearly outweigh the loss of social utilization that comes with preventing otherwise reasonable uses of land.

¶45  Moreover, since this bright-line rule has apparently never before been applied in an underground pipeline context, we would have to create specific contours of the rule to fit this situation. And we are unaware of any template for doing so. The difficulty associated with such an exercise is illustrated by the *Johnson* case. There, after adopting—in the ingress/egress context—the bright-line exception to the rule of mutual reasonableness, the court then noted as follows: "Permanent structures that do not interfere with the right to use the entire dimension of the easement, *such as an underground pipeline*, may be lawfully located within the boundaries of the easement because they do not encroach on the [dominant] owner's easement rights." *Johnson*, 319 P.3d at 488 (emphasis added). Thus, at least as Idaho articulates it, the bright-line exception to the rule of mutual reasonableness itself has an exception: for permanent structures located underground, on the basis that this category of permanent structures generally does not interfere with the dominant owner's primary use of the easement, namely, for ingress and egress. *Id.*

¶46  We are not at all certain—and the District offers no assistance in this regard—how such an exception to the exception would operate in this context, where the primary purpose for the

District's easement rights is for the District to operate an underground water pipeline. And we note, in this vein, that we have previously applied the rule of mutual reasonableness—without any exceptions—in a case involving a dispute the District was having with the local natural gas company in a spot where the Pipeline passed near to an underground gas pipeline. *See Metropolitan Water Dist. of Salt Lake & Sandy v. Questar Gas Co.*, 2015 UT App 265, ¶¶ 30–31, 361 P.3d 709 (applying the rule of mutual reasonableness, affirming a lower court's determination that the gas pipeline "does not constitute an unreasonable interference" with the Pipeline as a matter of law, and reasoning that both the District and the gas company "have always been able to, and continue to, effectively operate their respective pipelines within the SLA Corridor despite each other's presence" (quotation simplified)), *cert. denied*, 369 P.3d 451 (Utah 2016). We have a definite level of discomfort with being the first to create, and then apply, a version of the bright-line exception that would make sense in this context.

¶47 Finally, we—like Sorf—are not convinced that adoption of the bright-line rule in this context would cause any measurable reduction of the amount of litigation regarding the Pipeline. We certainly take the District's point that the Pipeline is a crucial piece of infrastructure for residents of the Salt Lake Valley, and that its continued operation is important to the quality of life that those residents enjoy. And we likewise empathize with the District's desire to avoid yard-specific litigation regarding the reasonableness of things like trees, sheds, hot tubs, basketball hoops, and mailboxes. But we remain far from persuaded that adoption of the District's desired bright-line rule would better facilitate those objectives than the existing legal regime does. Sorf points out—and the District acknowledges—that litigation along the Pipeline would not stop if the rule were adopted; instead, there would be an entirely new topic to litigate, namely, whether a structure is "permanent." The District posits that litigation around this topic would be "simple" compared to fights about

reasonableness, but we do not see why this would be so. As the dissenting opinion in *Johnson* pointed out, even "permanent structures are removable; it is only a question of how difficult it is." *See* 319 P.3d at 490–91 (Jones, J., dissenting). Litigation over "permanence" has the potential to be just as protracted, and just as fact-specific, as litigation over reasonableness.

¶48　For all of these reasons, then, we decline the District's invitation to adopt—in this case—a bright-line exception to the rule of mutual reasonableness that would apply to permanent structures built within the boundaries of a definite negotiated easement. To be clear, however, our decision to decline this invitation is specific to this case; we offer no opinion on whether adoption of a bright-line rule would be appropriate in cases involving an ingress/egress easement (the context in which the rule has been applied everywhere else). Our decision is simply that the bright-line rule has no applicability in this case, where the Easement at issue has to do with an underground pipeline.

¶49　It follows from this conclusion that the trial court did not err in refusing the District's request to provide the jury with an instruction articulating the bright-line rule. We therefore reject the District's assertion that this constituted error.

B

¶50　The District's other jury-instruction-related argument is its claim that the trial court's instructions regarding the parties' mutual obligation not to unreasonably interfere with the other's use of the land within the Easement were incomplete, inaccurate, and misleading. As best we can tell, the District makes three arguments in this regard, none of which we consider persuasive.

¶51　First, the District argues that the instructions the court gave omitted what it considers "an important legal principle," namely, "that the servient estate holder's use cannot make it more difficult or expensive for the dominant estate holder to enjoy its property

right." The District claims that, during trial, it focused its presentation on "the increased complexity and cost of using its [E]asement due to the [I]mprovements, while [Sorf's] strategy was to suggest that its use could be accomplished through a less expensive or complex means." It asserts that the court's "final instructions provided no guidance on the legal standards for such issues" and as a result "failed to provide jurors with a complete, accurate picture of the law governing unreasonabl[e] interference." We disagree.

¶52   In our view, the court's instructions—set out above, in paragraph 11—provided the jury with an accurate recitation of Utah law governing easements, including the rule of mutual reasonableness. *See Metropolitan Water Dist. of Salt Lake & Sandy v. SHCH Alaska Trust*, 2019 UT 62, ¶ 49, 452 P.3d 1158 ("An easement holder has the right to use its easement . . . in a way that does not unreasonably interfere with the property rights of the owner of the land[] and the owner of the land has the right to continue using its land so long as it does not unreasonably interfere with the easement holder's use of its easement." (quotation simplified)); *see also* Restatement (Third) of Property: Servitudes § 4.9 cmt. c (Am. L. Inst. 2000) ("In determining whether the holder of the servient estate has unreasonably interfered with exercise of an easement, the interests of the parties must be balanced to strike a reasonable accommodation that maximizes overall utility to the extent consistent with effectuating the purpose of the easement . . . ."). Notably for present purposes, those instructions included the following admonition: "The District can use up to the full width of its [E]asement for the repair, replacement, and reconstruction of the [Pipeline] in any particular method it chooses so long as the District does not unreasonably interfere with Mr. Sorf's reasonable use of his property." And those instructions made clear that Sorf was not allowed to "unreasonably interfere with the District's reasonable use of its [E]asement." In addition, the court instructed the jury to "consider the nature and character of the [I]mprovements within

the [E]asement," an admonition that at least implicitly invited the jury to consider the size and relative permanency of each Improvement as well as the potential costs of removal.

¶53    It is true that the instructions did not include any phrase expressly admonishing the jury that Sorf "cannot make it more difficult or expensive" for the District "to enjoy its property right." But the District points to no Utah case that uses this phraseology, let alone one that requires its inclusion in a jury instruction. The District relies most heavily, in this regard, upon a comment to the Restatement, which states that "[t]he more expensive the improvement or the more difficult its removal is likely to be, the more likely is the conclusion that the improvement is an unreasonable interference with the easement." *See* Restatement (Third) of Property: Servitudes § 4.9 cmt. c. But nothing in the court's instructions was contrary to this principle, and nothing prevented the District from arguing this principle to the jury as part of its presentation on mutual reasonableness. While the court could well have decided to include a sentence along the lines the District requested, we cannot conclude that the absence of that requested sentence rendered the court's instructions inaccurate or otherwise amounted to an abuse of discretion. *See Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 16, 977 P.2d 474 ("If the jury instructions as a whole fairly instruct the jury on the applicable law, reversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been." (quotation simplified)).

¶54    Second, the District takes issue with the court's omission, from its final instructions, of language that it believes would have "mitigate[d] the risk that jurors would" believe that "an easement is limited to what would be 'reasonably necessary' for the easement holder to access the property." It points to Sorf's arguments that "raised less extensive methods of accessing the [P]ipeline, suggested maintenance would not be necessary for years, offered alternative methods of excavation, and challenged

the District's reasonableness, all suggesting that the District could work around [Sorf's] [I]mprovements," and asserts that "an instruction clarifying that the District did not need to establish the full width was necessary or reasonably necessary for its use was appropriate." We reject this argument chiefly because the court's final instructions did not include any reference to a "reasonable necessity" standard, and because the instructions *did* include—as noted above—an admonition that "[t]he District can use up to the full width of its [E]asement for the repair, replacement, and reconstruction of the [Pipeline] in any particular method it chooses so long as the District does not unreasonably interfere with Mr. Sorf's reasonable use of his property."

¶55    Finally, the District argues that the instructions were confusing because they "included language suggesting the jury 'decid[e] whether the District's use of its [E]asement interferes with [Sorf's] use of his property' and expressly limited the District's right to use the full width of its property to methods that did 'not unreasonably interfere with [Sorf's] reasonable use of his property.'" Thus, the District argues that the instructions should not have described a rule of *mutual* reasonableness but, instead, should only "have been focused on whether [Sorf] unreasonably interfered with the District's [E]asement—not whether the District had interfered with [Sorf's] use of his property rights." But as already noted, Utah easement law quite clearly incorporates a rule of mutual reasonableness. *See SHCH Alaska Trust*, 2019 UT 62, ¶ 49. The trial court did not err at all—let alone commit an abuse of discretion—in describing the parties' reasonableness obligations as mutual.

¶56    Thus, we discern neither legal error nor abuse of discretion in the instructions the trial court gave to the jury. We therefore reject the District's arguments that the court improperly instructed the jury.

II. The Special Verdict Form

¶57    Next, the District takes issue with one aspect of the special verdict form that the trial court provided to the jury. That form contained ten questions, each one asking about the reasonableness of one of (or one grouping of) Sorf's Improvements. The first question asked whether Sorf's "uncovered deck unreasonably interfere[d] with the District's easement rights." The other nine questions were identical, except for replacement of the words "uncovered deck" with a description of another one of (or grouping of) the Improvements. Those were the only ten questions on the form, and the jury answered each one, individually, in the negative.

¶58    Some of the questions asked about a group of the Improvements, rather than one individual item. For instance, the jury was asked whether Sorf's "new trees," collectively, unreasonably interfered with the District's easement rights. And it was asked to consider whether the "pond and water feature," collectively, so interfered. But other questions asked only about individual Improvements, or even about a part of one of the Improvements. For instance, the jury was asked separate questions about the "Tuff Shed barn" and about the "concrete slab around the Tuff Shed barn," and was asked separate questions about the "rock retaining wall" and about the "decorative rock wall." But the questions about the rock walls asked about each wall as a complete item; the jury was not asked to consider individual segments or stones contained in the walls.

¶59    The District's issue with the special verdict form is that it did not include a question about the cumulative effect of the Improvements taken together. The District submitted a proposed special verdict form that would have asked some version of the following question: "Do any of Mr. Sorf's [I]mprovements, whether individually or taken together, unreasonably interfere with the District's [E]asement?" Sorf objected to the inclusion of

any such question in the verdict form, arguing that asking about cumulative effect would be "utterly unworkable in practice" because, at the end of the trial, the court needed to "be able to tell exactly what, if anything, the jury finds to be an unreasonable interference so that, if necessary, it can fashion an appropriate remedy." The court declined to ask the jury about any cumulative effect of the Improvements, reasoning that the jury needed to "decide each particular [I]mprovement all on its own" and "[i]ndependently" instead of "lump[ing] them all together."

¶60 Trial courts have "considerable discretion in accepting proposed special verdict forms." *Collins v. Wilson*, 1999 UT 56, ¶ 22, 984 P.2d 960. We will reverse a trial court's decision regarding the formatting of a special verdict form only "if the error is such that there is a reasonable likelihood that, in its absence, there would have been a result more favorable to the complaining party." *Senkosky v. Bistro 412 LLC*, 2022 UT App 58, ¶ 20, 512 P.3d 477 (quotation simplified). We perceive no abuse of discretion in the court's decision to utilize this particular special verdict form, nor do we discern any reasonable likelihood of a different result if a cumulative-effect question had been included.

¶61 As an initial matter, it appears that the court—and the parties—apparently gave at least some consideration to the issue of cumulativeness, in that the special verdict form grouped certain of the Improvements together and separated others. The verdict form asked one question about the reasonableness of the "Tuff Shed barn" and a separate question about the "concrete slab around the Tuff Shed barn." By contrast, the verdict form did not ask about the reasonableness of each individual tree Sorf had planted in his backyard; instead, it asked about all of the "new trees" together. Similarly, the verdict form did not ask about individual segments of the two walls Sorf had built in his backyard, asking instead about the "rock retaining wall" as a single unit and about the "decorative rock wall" as a single unit. Under the facts as we understand them, asking about the

decorative rock wall as one unit, in cumulative fashion (instead of about individual segments of it), made sense in this case, given that this wall was the only one of the Improvements located within nineteen feet of the Pipeline's center line. While another judge might have seen fit to divide the Improvements up in a different way for purposes of asking about their individual and cumulative reasonableness, or perhaps even seen fit to include an overall-cumulative-effect question on the verdict form, we cannot say that the trial court here—under the facts of this case—abused its discretion in utilizing this particular special verdict form.

¶62    Moreover, we recognize the validity of Sorf's concern that inclusion of an overall-cumulative-effect question may have made it more difficult—rather than less difficult—for the court to have fashioned a remedy for any unreasonableness. If such a question had been included and had been answered in the affirmative but all the individual questions had been answered in the negative, it is unclear what the remedy would have been. Special verdict forms should, after all, be helpful, and if inclusion of a particular question would not help the court in its effort to arrive at an adequate and just remedy, that question need not be included.

¶63    Finally, the District has not carried its appellate burden of demonstrating a reasonable likelihood of a different result had an overall-cumulative-effect question been included on the verdict form. For one thing, the evidence indicated that all the Improvements (except for the decorative rock wall) were located at least nineteen feet away from the Pipeline's center line, and many of them (including many of the largest ones) were located much farther away from the Pipeline's center line. *See* Appendix. The jury also heard evidence indicating that the District had developed a practice of allowing trees inside easements, as long as they were located at least twenty feet away from the Pipeline's center line, so that the District had a forty-foot swath of unencumbered land within which to conduct repairs. And the jury heard evidence (largely from Engineer, as discussed below,

but also from Manager) that the District, if it ended up needing to excavate on Sorf's property, would likely be able to complete its work within that forty-foot zone. In addition, as noted, the jury was asked to consider the cumulative reasonableness of some of the Improvements, such as "new trees" and entire rock walls, including the decorative rock wall (the Improvement nearest the Pipeline). And the jury was asked to consider the individual reasonableness of each of the other Improvements. In responses to these questions, the jury concluded that none of the Improvements unreasonably interfered with the District's easement rights. Given the evidence presented, and given the jury's responses to the questions on the existing verdict form, we do not think it reasonably likely that the jury would have reached a different result had the form included an additional question about the overall cumulative effect of the Improvements.

¶64    Accordingly, we reject the District's appellate challenge to the special verdict form.

### III. Engineer's Testimony

¶65    Finally, the District asserts that the trial court erred by not placing a requested limitation on Engineer's testimony. In particular, the District takes issue with the court's decision not to bar Engineer from testifying "about possible alternative methodologies for the rehabilitation of" the Pipeline, asserting that Engineer's testimony along these lines was not helpful to the jury "because the question pending before the jury was the reasonableness of [Sorf's] existing use of the property" rather than the reasonableness of the District's likely uses of the property. As the District puts it, this evidence "neither changed nor bore on the fact that the District possessed a legal right to use the *entire* width of its [E]asement for emergency repairs, maintenance, or reconstruction of the [Pipeline] in the future." In addition, the District argues that Engineer's testimony "improperly suggested that the District's [E]asement should be limited in geographic

scope," and it asserts that this testimony had the "net effect" of suggesting that "the District's use of its [E]asement should be limited to what was reasonably necessary," in violation of our case law. *See Carrier v. Lindquist*, 2001 UT 105, ¶ 20, 37 P.3d 1112 (declining to apply "the reasonable necessity test to disputes over private easements" because it "would give a servient estate the power to obstruct an easement, and then extinguish or limit that easement, by claiming that the easement was not reasonably necessary for the easement holder to access his or her property").

¶66 To the extent that the District's arguments are reliant on the notion that the reasonableness inquiry runs in only one direction, we reject those arguments for the reasons already stated. *See supra* ¶ 55. Utah quite clearly follows a rule of mutual reasonableness. Moreover, in any holistic assessment of the reasonableness of Sorf's Improvements, it is highly relevant what sorts of uses the District—given current technologies and economic conditions—is likely to make of the property inside the Easement. And as already noted, the court instructed the jury that the District *was* allowed to use the entire width of its Easement "so long as the District does not unreasonably interfere with Mr. Sorf's reasonable use of his property." Moreover, there is nothing in the record to indicate that the jury substituted a "reasonable necessity" inquiry for the "mutual reasonableness" inquiry. No jury instruction contained the phrase "reasonably necessary." And the District points us to no place in the attorneys' respective arguments where anyone urged the jury to apply a "reasonable necessity" standard.

¶67 Accordingly, we discern no error in the trial court's refusal to limit Engineer's testimony as requested.

CONCLUSION

¶68 We decline the District's invitation, in this case, to apply a bright-line exception—one that would be applicable only to

permanent structures built inside negotiated easements of definite dimension—to the rule of mutual reasonableness that has long been applied to easement disputes in Utah. And we discern no other infirmities in the trial court's instructions or special verdict form. Finally, we discern no error in the court's denial of the District's request to limit Engineer's trial testimony.

¶69    Affirmed.

————————

APPENDIX



(1) Uncovered Deck
(2) Small Shed on Concrete Blocks
(3) New Trees
(4) Rock Retaining Wall at Water Feature
(5) Pond and Water Feature
(6) Covered Deck
(7) Hot Tub
(8) Tuff Shed Barn
(9) Concrete Slab
(10) Decorative Rock Wall